[No. 25795-5-II.   Division Two.   August 24, 2001.]

JAY CAULFIELD, *Respondent*, v. KITSAP COUNTY, *Appellant*.

244

*Russell D. Hauge, Prosecuting Attorney*, and *Jacquelyn M. Aufderheide, Deputy*; and *William R. Hickman* (of *Reed McClure*), for appellant.

*David P. Moody* and *Stephanie B. Bloomfield* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, P.L.L.C.*); and *Marc D. Gianneschi* (of *Bennett Rainey Moran & Gianneschi*), for respondent.

BRIDGEWATER, J. — Kitsap County appeals a judgment against it for negligence in the management of Jay Caulfield's in-home care resulting in severe personal injuries. The County contends that the public duty doctrine applied and it was immune from suit. We hold that when the County undertook in-home care management for Caulfield, who was already a profoundly disabled, vulnerable adult with multiple sclerosis, a special relationship exception to the public duty doctrine applied. The County also contends the trial court erred by improperly admitting evidence under ER 904 and by denying its motion for a new trial based on improper closing arguments by Caulfield's counsel; these arguments are meritless. Jay Caulfield cross-appeals, contending that the Department of Social and Health Services (DSHS) should not have been on the verdict form because there was no evidence that DSHS was at fault. But we find substantial evidence of fault, even though Caulfield had settled with DSHS. We affirm.

Jay Caulfield filed a complaint in 1998 against DSHS, Kitsap County, and James Sellars, who was Caulfield's personal care provider, for injuries sustained while in Sellars' care.

Caulfield suffered from multiple sclerosis and needed 24 hour care. He had only limited use of his hands and needed assistance with eating, transferring, body positioning, and personal hygiene.

DSHS authorized Caulfield to receive personal care in his

own apartment from an in-home caregiver paid by DSHS through the COPES (Community Options Program Entry System) program. COPES is a federally funded program designed to provide the means for disabled persons to live in an independent situation. Prior to living in an apartment, Caulfield was a DSHS client at a Bremerton nursing facility and had been monitored by DSHS caseworker Debbie Mark-Corpolongo (Corpolongo) for several months. Corpolongo contracted with Sellars to provide Caulfield's in-home care. Caulfield left the Bremerton nursing facility and received in-home care from Sellars from around September 6, 1995, to November 2, 1995, as part of the COPES program.

Corpolongo was aware of Caulfield's vulnerable condition when she placed Caulfield in the COPES program. Although Corpolongo informed Caulfield that she would continue to be his caseworker, Corpolongo did not visit Caulfield for a reassessment until October 23, 1995, more than a month after he left the nursing facility. During the reassessment, Corpolongo met with Caulfield and Sellars and heard Caulfield's complaints about his caregiver. Corpolongo noted in her case file that Caulfield's skin condition was poor, he was experiencing hallucinations, and there were additional problems that needed attention. Those observations were a major change in Caulfield's condition while his case was under DSHS case management.

On October 24, 1995, Corpolongo telephoned County social worker Eleanor Morris to transfer the case and report her concerns. Morris noted that there were problems that needed "immediate attention." Ex. 13. Corpolongo maintained ongoing case management responsibilities until October 25, 1995, when she personally transferred Caulfield's entire file and case notes to Morris. Corpolongo and Morris met for about 40 minutes and discussed Caulfield's case needing more intensive case management. Such meetings transferring COPES files between DSHS and the County were rare.

The County offered COPES case management services

based on a July 1, 1995, Interagency Agreement between DSHS and the County. In the agreement, the County assumed responsibility for monitoring and providing oversight and case management services to functionally impaired vulnerable adults receiving in-home care living in Kitsap County. The agreement required these services to be provided through several programs, including the COPES program.

Morris never performed a reassessment of Caulfield or had any contact with Caulfield. Morris called Sellars on November 1, 1995, to arrange a visit. The next day, November 2, 1995, Sellars called Morris, stating Caulfield was not doing well. Morris told Sellars to call 911. That day Caulfield was admitted to the emergency room in critical condition. By the time he was treated, Caulfield's condition was grave. The parties do not dispute that Caulfield sustained severe injuries. He had urosepsis, pneumonia, saline depletion, contractures, was malnourished, suffered severe weight loss, and had severe bed sores that had cut through his flesh to his bone. And even though Caulfield had multiple sclerosis, he previously had some ability to function at levels that allowed an appreciable amount of independence and freedom. But because of the above conditions, he lost most of the ability to function with any independence.

Caulfield sued the County and DSHS on two claims: common law negligence and failure to make an oral report under RCW 74.34.030. The County moved for summary judgment on several grounds including that the County had no duty to Caulfield. The trial court denied summary judgment. Caulfield settled with DSHS.

At trial, Caulfield presented only three expert witnesses, Dr. von Preyss-Friedman, Dr. Rollins, and Dr. Conte. The experts testified that Sellars failed to adequately care for Caulfield and that the case managers did not meet their ordinary standard of care. Caulfield presented no further evidence.

The County moved for a directed verdict again, asserting

that it owed no duty to Caulfield and that Caulfield's case did not fall within the exceptions to the public duty doctrine. The trial court denied the motion. The jury returned a verdict finding that the County, DSHS, and Sellars were negligent and had proximately caused Caulfield's injuries. The jury found that the County did not violate RCW 74.34.030 and that Caulfield was not contributorily negligent. It allocated fault: 40 percent to the County, 40 percent to DSHS, and 20 percent to Sellars. The jury found that Caulfield sustained a total of $2,626,707 in damages. The trial court entered a judgment of $1,576,024 against the County and Sellars.

The County filed a posttrial motion for judgment as a matter of law. It repeated the argument that Caulfield never cited to any authority to establish a duty. The County also moved for a new trial based on improper statements that Caulfield's counsel made during closing arguments. The trial court denied the County's motions.

## I. Duty

■ The existence of a duty is a question of law and depends on mixed considerations of " 'logic, common sense, justice, policy, and precedent.' " *Hartley v. State*, 103 Wn.2d 768, 779, 698 P.2d 77 (1985) (quoting *King v. City of Seattle*, 84 Wn.2d 239, 250, 525 P.2d 228 (1974)).

The County contends that it owed Caulfield no duty because it was immune under the public duty doctrine and Caulfield never showed that one of the exceptions to the public duty doctrine applied. Caulfield argues that the County owed him several duties, including duties derived from the Aging and Adult Services Field Manual on case management and a duty of reasonable, ordinary care while the County was responsible for managing his in-home care. Caulfield claims the public duty doctrine does not apply because the County's management of his COPES in-home care was a proprietary function, not a regulatory function. In the alternative, Caulfield contends that the special

relationship exception or the legislative intent exception to the public duty doctrine applies.

■ The County argues that the trial court erred by denying its motions for judgment as a matter of law, directed verdict, or summary judgment on the grounds that it owed Caulfield no duty and the public duty doctrine applied. Denial of a motion for summary judgment is generally not an appealable order, RAP 2.2(a), and discretionary review of such orders is not ordinarily granted.[1] *DGHI Enters. v. Pac. Cities, Inc.*, 137 Wn.2d 933, 949, 977 P.2d 1231 (1999). It makes no substantive difference in the standard of review whether the procedural mechanism for the trial court to arrive at its result was a motion for summary judgment, a motion for directed verdict, or a motion for judgment as a matter of law. *See Bratton v. Calkins*, 73 Wn. App. 492, 496, 870 P.2d 981, *review denied*, 124 Wn.2d 1029 (1994). The issue before this court is the same: whether, as a matter of law, the County owed an actionable duty to Caulfield. Accordingly, we review only the motion for judgment as a matter of law. *See Huston v. First Church of God*, 46 Wn. App. 740, 732 P.2d 173, *review denied*, 108 Wn.2d 1018 (1987).

■ ■ The County argues that several of Caulfield's arguments on the public duty doctrine cannot be raised on appeal because he did not raise them below. But the County's argument is not supported by its citation to RAP 9.12.[2] That rule is a special rule applicable only to summary judgments. And we are not reviewing the denial of summary judgment. Thus, RAP 9.12 does not apply. In addition, the County's claims are not accurate. Caulfield did discuss the special relationship exception and the legislative intent

---

[1] When a trial court denies summary judgment due to factual disputes and a trial is subsequently held on the issue, the losing party must appeal from the sufficiency of the evidence presented at trial. *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 35 n.9, 864 P.2d 921 (1993); *Herring v. Dep't of Soc. & Health Servs.*, 81 Wn. App. 1, 14, 914 P.2d 67 (1996). The County asserts it has no duty, and whether a duty exists is a question of law.

[2] RAP 9.12 provides in part: "On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court."

exception below. More importantly, under RAP 2.5(a)[3] a party may argue a ground for affirming the trial court which was not presented below if, as here, the record is sufficient to establish that ground. Thus, this court may consider any of the exceptions to the public duty doctrine in determining whether an actionable duty existed against the County.

A. Standard of Review

■ ■ Motions for directed verdicts or judgment as a matter of law are appropriate if, after viewing the evidence in the light most favorable to the nonmoving party, the trial court determines there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party. *Goodman v. Goodman*, 128 Wn.2d 366, 371, 907 P.2d 290 (1995). Our review of a denial of a motion for judgment as a matter of law is confined to whether the evidence presented was sufficient to sustain the jury's verdict. *See Wright v. Engum*, 124 Wn.2d 343, 356, 878 P.2d 1198 (1994). We will not overturn a verdict as long as the record contains enough evidence to persuade a rational, fair-minded person of the truth of the matter in question. *Wlasiuk v. Whirlpool Corp.*, 81 Wn. App. 163, 170, 914 P.2d 102, 932 P.2d 1266 (1996).

B. Public Duty Doctrine

■ The threshold determination in a negligence action is whether a duty of care is owed by the defendant to the plaintiff. *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988). Under the public duty doctrine, the plaintiff seeking recovery from a municipal corporation in tort must show that " 'the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (i.e., a duty to all is a duty to no one).' " *Taylor*, 111 Wn.2d at 163 (quoting *J&B Dev. Co. v. King County*, 100 Wn.2d 299, 303, 669 P.2d 468 (1983)).

---

[3] RAP 2.5(a) provides in part: "A party may present a ground for affirming a trial court decision which was not presented to the trial court if the record has been sufficiently developed to fairly consider the ground."

■ Courts recognize numerous exceptions to the public duty doctrine. *Taggart v. State*, 118 Wn.2d 195, 217, 822 P.2d 243 (1992) (citing *Bailey v. Town of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257, 753 P.2d 523 (1987)). These exceptions generally embody traditional negligence principles, and may be used as "focusing tools" to determine whether the public entity had a duty to the injured plaintiff. *Taggart*, 118 Wn.2d at 217-18 (citing *Taylor*, 111 Wn.2d at 166). These exceptions do not create new duties or eliminate recognized duties. *Meaney v. Dodd*, 111 Wn.2d 174, 178, 759 P.2d 455 (1988). The question whether an exception to the public duty doctrine applies is thus another way of asking whether the State had a duty to the plaintiff. *Taggart*, 118 Wn.2d at 218.

■ We may consider any of the exceptions to the public duty doctrine and affirm the trial court as long as the record has been sufficiently developed to fairly consider the ground. *See* RAP 2.5(a); *Nast v. Michels*, 107 Wn.2d 300, 308, 730 P.2d 54 (1986). Caulfield submits that the County and Morris had a duty to manage Caulfield's case with an ordinary and reasonable standard of care as evidenced by the expert testimony and the COPES caseworker manual. Caulfield maintains that he may recover for the breach of this duty because it was owed to COPES patients individually and it was not a general obligation owed to the public in general. Because we hold that the County has a duty under the special relationship exception to the public duty doctrine, we will not address any of the other exceptions (i.e., the proprietary function or the legislative intent exceptions).

1. Special Relationship Exception

■ The Supreme Court has recognized two varieties of the special relationship exception to the public duty doctrine. *Stenger v. State*, 104 Wn. App. 393, 399, 16 P.3d 655, *review denied*, 144 Wn.2d 1006 (2001). The first, well-established exception arises where (1) there is direct contact or privity between the governmental agency and the plaintiff "which sets the latter apart from the general

public, and (2) there are express assurances given by a public official [or agency], which (3) gives rise to justifiable reliance on the part of the plaintiff." *Taylor*, 111 Wn.2d at 166; *see also Meaney*, 111 Wn.2d at 178-79; *Honcoop v. State*, 111 Wn.2d 182, 192, 759 P.2d 1188 (1988).

The exception certainly applies to DSHS because (1) there was direct contact or privity between DSHS and Caulfield which set Caulfield apart from the general public and (2) there were express assurances given by DSHS caseworker Corpolongo, including case management and crisis intervention, which (3) gave rise to justifiable reliance by Caulfield through his acceptance of the case manager's detailed duties. *See Taylor*, 111 Wn.2d at 171. With that special relationship established, the County became liable to the same extent that DSHS was liable when the County contracted with DSHS *and* the County social worker, Morris, took Caulfield's file and assumed the responsibility for Caulfield's case. *See Champagne v. Spokane Humane Soc'y*, 47 Wn. App. 887, 892, 737 P.2d 1279 (where the court recognized that the defendant, a private entity, by contracting with the city to provide animal control services "had undertaken to carry out the governmental function of animal control" and held the public duty doctrine applied and protected the private defendant), *review denied*, 108 Wn.2d 1035 (1987).

The argument that Caulfield did not personally meet with a County representative so that the County never assured him of his continued monitoring through the County's contractual relationship with DSHS is specious and meritless. And, although we find a special relationship here, there was also a special relationship under section 315 of the *Restatement (Second) of Torts* (1965).

2. Special Relationship under *Restatement (Second) of Torts* § 315

As a general rule, there is no duty to control the conduct of a third person to prevent him from causing physical harm to another unless a special relationship exists. *Niece v. Elmview Group Home*, 131 Wn.2d 39, 43, 929 P.2d 420

(1997); *Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983). Washington has recognized an exception to this general rule and a second variety of special relationship under the public duty doctrine in cases where " 'a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct.' " *Niece*, 131 Wn.2d at 43 (quoting *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 227, 802 P.2d 1360 (1991)); *see also Taggart*, 118 Wn.2d at 218 n.4. This special relationship is described in section 315 of the *Restatement (Second) of Torts*, which provides:

> "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection."

*Petersen*, 100 Wn.2d at 426 (quoting RESTATEMENT (SECOND) OF TORTS § 315 (1965)); *see also Taggart*, 118 Wn.2d at 218. Caulfield's negligence claim is based on the latter type of special relationship, the relationship between the County and Caulfield.

Washington courts describe those relationships between a defendant and a foreseeable victim where the defendant has a special relationship with the victim as "protective in nature, historically involving an affirmative duty to render aid." *Hutchins.*, 116 Wn.2d at 228 (citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 56, at 383 (5th ed. 1984)).

For example, a school has a duty to protect students in its custody from reasonably anticipated dangers. *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 320, 255 P.2d 360 (1953). *See also J.N. v. Bellingham Sch. Dist. No. 501*, 74 Wn. App. 49, 57, 871 P.2d 1106 (1994); *Briscoe v. Sch. Dist. No. 123*, 32 Wn.2d 353, 362, 201 P.2d 697 (1949). The rationale for such a duty—the placement of the student

in the care of the defendant with the resulting loss of the student's ability to protect himself or herself—is also the basis for the similar duty of an innkeeper to protect guests from the criminal actions of third parties. *Niece*, 131 Wn.2d at 44; *see also Miller v. Staton*, 58 Wn.2d 879, 883, 365 P.2d 333 (1961).

> "Other relationships falling into the general group of cases where the defendant has a special relationship with the victim are also protective in nature, historically involving an affirmative duty to render aid. The defendant may therefore be required to guard his or her charge against harm from others. Thus a duty may be owed from a carrier to its passenger, from an employer to an employee, from a hospital to a patient, and from a business establishment to a customer."

*Niece*, 131 Wn.2d at 44 (quoting *Hutchins*, 116 Wn.2d at 228). *See also Bartlett v. Hantover*, 9 Wn. App. 614, 620-21, 513 P.2d 844 (1973) (duty of employer to protect employees from criminal activity to which the employment exposes the employee), *rev'd on other grounds*, 84 Wn.2d 426 (1974)); *Marks v. Alaska S.S. Co.*, 71 Wash. 167, 127 P. 1101 (1912) (duty of common carrier to protect passengers from crew members); *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 202-03, 943 P.2d 286 (1997) (duty of business establishment to protect its customers).

In *Hunt v. King County*, 4 Wn. App. 14, 481 P.2d 593, *review denied*, 79 Wn.2d 1001 (1971), a disturbed and suicidal patient was admitted to the psychiatric ward of a county hospital. The patient was injured when he found an open window and jumped five stories to the ground. The Court of Appeals held that the hospital owed the patient a duty of care, which included a "duty to safeguard the patient from the reasonably foreseeable risk of self-inflicted harm through escape." *Hunt*, 4 Wn. App. at 20.

The Supreme Court has recognized that a hospital or group home's duty of reasonable care to protect its patients from the tortious or criminal actions of third parties is based on the special relationship between the hospital or home and its vulnerable patient. *Niece*, 131 Wn.2d at 46

n.2. In *Niece*, a developmentally disabled woman brought an action for damages against a group home after she was sexually assaulted by a staff member. The court held that the group home for developmentally disabled persons had a duty to protect its residents from *all* foreseeable harms. *Niece*, 131 Wn.2d at 41, 47. " '[T]here is no reason to differentiate between foreseeable harms caused by potentially hazardous physical conditions (*McLeod*), visitors (*Shepard* [*v. Mielke*, 75 Wn. App. 201, 877 P.2d 220 (1994)]) or staff.' " *Niece*, 131 Wn.2d at 47 n.4 (quoting *Niece v. Elmview Group Home*, 79 Wn. App. 660, 669, 904 P.2d 784 (1995)).

In the above cases imposing a duty based on a special relationship, the courts have found that the relationship involved an element of "entrustment"; i.e., one party was, in some way, entrusted with the well-being of the other party. *Webstad v. Stortini*, 83 Wn. App. 857, 869, 924 P.2d 940 (1996) (citing *Lauritzen v. Lauritzen*, 74 Wn. App. 432, 440, 874 P.2d 861, *review denied*, 125 Wn.2d 1006 (1994)), *review denied*, 131 Wn.2d 1016 (1997); *Niece*, 131 Wn.2d at 50. Special relationships are typically custodial or at least supervisory, such as the relationship between doctor and patient, jailer and inmate, or teacher and student. *See Webstad*, 83 Wn. App. at 869-70 ("special relationship" duty arises when the relationship has a direct supervisory component, but does not always require the presence of a custodial relationship).

The special relationship between the County and Caulfield, its vulnerable client, is perhaps more significant, for purposes of the County's duty of care, than the recognized special relationships between a common carrier and its passengers or between a hotel and its guests. As noted, these special tort duties are based on the liable party's assumption of responsibility for the safety of another. *Niece*, 131 Wn.2d at 46 (citing *Lauritzen*, 74 Wn. App. at 440). Passengers and hotel guests are merely away from familiar surroundings and relying on their hosts to take the same reasonable precautions that they would take at home. Profoundly disabled persons are totally unable to protect

themselves and are thus completely dependent not only on their caregivers but also their case managers for their personal safety.

Caulfield's relationship with his County case manager involved an element of "entrustment" by virtue of the dependent and protective nature of the relationship. Caulfield's case file showed he could not get out of bed and could not reach the telephone for assistance. Given Caulfield's inability to take care of himself, the case manager's responsibility for establishing and monitoring his in-home service care plan took on great significance. COPES case managers were responsible for establishing Caulfield's service plans, monitoring his care, and providing crisis management, including terminating in-home care if it was inadequate to meet his needs. And the case managers were required to make assessment visits. This responsibility gave rise to a duty to protect Caulfield and other similarly vulnerable clients from the tortious acts of others, especially when a case manager knows or should know that serious neglect is occurring. This duty is limited by the ordinary care a case manager would take in similar situations and by the concept of foreseeability. Accordingly, we hold that Morris had a duty to use reasonable care in her position as County case manager to protect Caulfield from Sellars' tortious actions.

The County's main argument is that neither the trial court nor Caulfield ever specified what authority established its duty or what exception to the public duty doctrine applied. The County contends the trial court improperly found the issue of duty was a question of fact which had been established by the testimony in this case. This argument is based on an incorrect understanding of the special relationship duty to protect others. When there is a special relationship under section 315 of the *Restatement (Second) of Torts*, the general duty is to use reasonable care to protect from the tortious acts of others. *See Nivens*, 133 Wn.2d at 203-05. The issue of reasonable care is a question for the jury. Further, the duty is limited by the concept of

foreseeability. *Niece*, 131 Wn.2d at 50. In this case, the experts' opinion that the caseworkers acted inappropriately in not reacting to signs of neglect sufficiently raised the factual issues of whether the County exercised due care and whether Sellars' neglect was foreseeable. Morris took no action even though she had knowledge that Caulfield's case needed immediate attention and she had Caulfield's case file with complaints of serious neglect.

In addition, the County misconstrues the significance of the contract where the County assumed the duty to manage the COPES participants' in-home care. Caulfield's argument is not based on the breach of this contract giving rise to an action in tort. Nor does Caulfield's suit rest on a third party beneficiary claim. Rather, the contract incorporates the Aging and Adult Services Field Manual, which enumerates minimum requirements for COPES case managers. The contract thus provides evidence of the reasonable standard of care for caseworkers managing COPES in-home care placements.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Affirmed.

HUNT, A.C.J., and SEINFELD, J., concur.