**BOY 1, Boy 2, Boy 3, Boy 4, Boy 5, and Boy 6, Plaintiffs,**

v.

**BOY SCOUTS OF AMERICA, a congressionally chartered corporation incorporated in the District of Columbia, Defendant.**

**Case No. C10–1912–RSM.**

United States District Court, W.D. Washington, at Seattle.

May 19, 2011.

Leander L. James, IV, James Vernon & Weeks P.A., Coeur D'Alene, ID, Timothy D. Kosnoff, Daniel T.L. Fasy, Kosnoff PLLC, Seattle, WA, for Plaintiffs.

Anthony Todaro, Barbara J. Kastama, Kelly P. Corr, William Randolph Squires, III, Corr Cronin Michelson Baumgardner & Preece, Seattle, WA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

RICARDO S. MARTINEZ, District Judge.

### I. INTRODUCTION

This matter comes before the Court upon Defendant's Motion to Dismiss. Dkt # s 6, 20. For the reasons set forth below, Defendant's motion is GRANTED.

### II. BACKGROUND

Plaintiffs are six adult men who were sexually abused by their scout leaders in connection with their participation in the Boy Scouts of America organization ("BSA") when they were children. Plaintiffs allege that, long before Plaintiffs' abuse, BSA knew that it had a problem with pedophiles and other sexual deviants infiltrating their ranks. In 1910, shortly after BSA was founded as a congressional-

ly chartered corporation, BSA implemented an internal record keeping system aimed at preventing scout leaders who were expelled for sexual deviance from rejoining other scout troops. Originally, the system entailed placing a red sticker on the expelled or rejected man's registration card. Later, the system grew into a large database in which each flagged individual's name and suspected activity was logged and stored. This database became known as the Ineligible Volunteer Files ("IV Files"). According to Plaintiffs, the IV Files highlighted BSA's vulnerabilities, including pedophiles' techniques for infiltrating the BSA organization and grooming victims. They also demonstrated biographical and behavioral characteristics shared by the pedophiles that had been discovered within the organization.

By 1935, the BSA had purportedly amassed a list of 2,000 ineligible volunteers. In the 1970s, BSA executives destroyed thousands of IV Files. According to Plaintiffs, had the files not been destroyed, the BSA would have catalogued over 20,000 pedophiles in its files by 2005. However, approximately 6,000 files survived the 1970s "purge," 1900 of which are now in the public domain.

Plaintiffs allege that BSA opened a new IV File on a pedophile every other day for fifty years, demonstrating that BSA knew or should have known that scouting attracts pedophiles at a high rate and that scouting's distinctive characteristics attract pedophiles. However, until the late 1980s, BSA's only background check for scout leaders was a check of the man's application against the IV File list. According to plaintiffs, some pedophiles who had been rejected from the organization successfully reentered the BSA as scout leaders of different troops. In addition, BSA purportedly re-admitted some pedophiles it had previously removed for child abuse after a period of "probation." BSA had a practice of not reporting scout abuse incidents to law enforcement and reaching agreements with suspected pedophiles in which pedophiles agreed to leave the organization in exchange for the BSA not reporting incidents of child abuse to the authorities.

Plaintiffs allege that BSA did not notify the public that the IV Files existed, did not advise anybody of the number of pedophiles it was rejecting from scouting each year, and did not advise scouts or their parents that it knew that its system did not completely prevent pedophiles that had been rejected from BSA from re-infiltrating the organization. Plaintiffs claim that the IV Files constituted a "treasure trove" of knowledge about pedophilia and the BSA but that the organization deliberately concealed the body of knowledge from police, scouts, scouts' parents, and the general public.

Each Plaintiff alleges that had BSA warned Plaintiffs or their parents about the problem of scout leaders molesting scouts or informed Plaintiffs or their parents about how to prevent scout leader sexual abuse, Plaintiffs would not have joined or been allowed to join the BSA, or would have taken steps to prevent the sexual abuse they ultimately suffered at the hands of their scout leaders. Plaintiffs bring claims against BSA for (1) negligence and breach of fiduciary duty; (2) willful misconduct, wanton misconduct and reckless misconduct; (3) intentional infliction of emotional distress; (4) violation of RCW 9.68A: Sexual Exploitation of Children Act ("SECA"); (5) Estoppel and Fraudulent Concealment; and (6) Civil Conspiracy.

Plaintiffs Boy 4, Boy 5, and Boy 6 originally filed a separate action in this district (C10–2032–RSM) in which Plaintiffs brought the same six claims against the BSA in connection with three additional

allegations of sexual abuse at the hands of scout leaders. On April 5, 2011, this Court granted Plaintiffs' motion to consolidate the two actions for the purposes of pre-trial matters. Dkt. # 19. At the time of consolidation, BSA had pending in each action nearly identical motions to dismiss Plaintiffs' claims for failure to state a claim upon which relief could be granted. The pending motion in the C10–2032–RSM case was thereby transferred to the instant case (Dkt.# 20) for adjudication in conjunction with the motion to dismiss pending in the case at bar (Dkt.# 6). The two motions to dismiss argue that Plaintiffs' claims should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because (a) BSA owed no duty to protect Plaintiffs from the criminal acts of scout leaders; (b) Plaintiffs' claim for willful and wanton misconduct is not an independent cause of action under Washington law; (c) Plaintiffs have not pled the necessary elements for the claim of outrage; (d) Plaintiffs cannot recover under SECA because no criminal violations have been pursued; (e) estoppel and fraudulent concealment are not causes of actions recognized under Washington law; and (f) Plaintiffs' claim for civil conspiracy is barred by the intracorporate conspiracy doctrine. The Court hereby addresses the two motions to dismiss, which are referred to in the singular form, as "Defendant's Motion to Dismiss," for ease of reference.

## III. DISCUSSION

### A. Standard of Review

Plaintiffs urge the Court to consider evidence outside the pleadings and thereby convert Defendant's Motion to Dismiss into a Motion for Summary Judgment under Fed.R.Civ.P. 56. The Court need not convert a Rule 12(b)(6) motion to a motion for summary judgment simply because extraneous materials are introduced if the Court does not consider those materials in deciding the motion. *Keams v. Tempe Technical Institute, Inc.*, 110 F.3d 44, 46 (9th Cir.1997). Here, consideration of Plaintiffs' extraneous evidence is unnecessary to the resolution of Defendant's motion. Therefore, the Court declines to convert the motion.

In considering a Rule 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff has alleged sufficient facts to state a claim for relief which is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is facially plausible if the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). In making this assessment, the Court accepts all facts alleged in the complaint as true, and makes all inferences in the light most favorable to the non-moving party. *Barker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir.2009) (internal citations omitted). The Court is not, however, bound to accept the plaintiff's legal conclusions. *Iqbal*, 129 S.Ct. at 1949–50. While detailed factual allegations are not necessary, the plaintiff must provide more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

### B. Negligence

■ As a general rule, there is no duty to prevent a third party from intentionally harming another unless "a special relationship exists between the defendant and either the third party of the foreseeable victim of the third party's conduct." *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wash.2d 217 227, 802 P.2d 1360 (1991). In

other words, a duty arises where: "(a) a special relation exists between the [defendant] and the third person which imposes a duty upon the [defendant] to control the third person's conduct, or (b) a special relation exists between the [defendant] and the other which gives the other a right to protection." *Petersen v. State*, 100 Wash.2d 421, 426, 671 P.2d 230 (1983) (quoting Restatement (Second) of Torts § 315 (1965)). BSA argues that Plaintiffs' negligence claim should be dismissed because the BSA does not have a special relationship with either the Plaintiffs or scout leaders.

■ "[S]pecial relationships are typically custodial," as between common carriers and their passengers, or hotels and their guests. *See Caulfield*, 108 Wash.App. 242, 255, 29 P.3d 738 (2001). However, a relationship need not be custodial where there is a direct, supervisory component. *See Taggart v. State*, 118 Wash.2d 195, 219, 223, 822 P.2d 243 (1992) (special supervisory relationship may arise when parole officers have taken charge of parolees they supervise, even though there is no custodial relationship); *but see Cox v. Malcolm*, 60 Wash.App. 894, 900, 808 P.2d 758 (1991) (no special relationship between step-grandparent and step-grandchild), *review denied*, 117 Wash.2d 1014, 816 P.2d 1224 (1991). In all cases, the duty to protect another person from the intentional or criminal actions of third parties generally arises where one party is "entrusted with the well being of another." *Niece v. Elmview Group Home*, 131 Wash.2d 39, 50, 929 P.2d 420 (1997) (citing *Lauritzen*, 74 Wash.

App. at 440, 874 P.2d 861)." *See also Caulfield v. Kitsap County*, 108 Wash.App. 242, 255, 29 P.3d 738 (2001) (collecting cases).[1]

The Washington Supreme Court has yet to decide whether the BSA and similar youth–serving organizations owe a duty towards the youth members of its organization to take reasonable precautions to protect them from the danger of sexual molestation at the hands of organization members. The most analogous cases are those involving the negligence liability of churches for the sexual abuse of child congregation members by clergy. *See C.J.C. v. Corporation of Catholic Bishop of Yakima*, 138 Wash.2d 699, 985 P.2d 262 (1999); *Doe v. Corporation of President of Church of Jesus Christ of Latter–Day Saints*, 141 Wash.App. 407, 167 P.3d 1193 (2007). *C.J.C.* held, as a matter of first impression, that "churches (and other religious organizations) [are] subject to the same duties of reasonable care as would be imposed on any person or entity in selecting and supervising their workers, or protecting vulnerable persons within their custody, so as to prevent reasonably foreseeable harm." 138 Wash.2d 699, 722, 985 P.2d 262 (1999). Thus, a church enjoys a special relationship with its "workers" and with "vulnerable persons within its custody." *Id.* In the case at bar, Plaintiffs' complaint does not allege that the scout leaders were the BSA's "workers," in the manner held sufficient to support a special relationship in *C.J.C.*, nor do Plaintiffs allege that Plaintiffs were vulnerable persons in the custo-

---

1. Doctors and patients, jailers and inmates, and teachers and students have all been found to have special relationships. *See Caulfield*, 108 Wash.App. at 255, 29 P.3d 738. *Webstad v. Stortini*, 83 Wash.App. 857, 868 n. 6, 924 P.2d 940 (1996). Courts have also found special relationships between a group home for the developmentally disabled and its residents *see Niece*, 131 Wash.2d at 46, 929 P.2d 420; a

hospital and its patients, *see Hunt v. King County*, 4 Wash.App. 14, 481 P.2d 593 (1971); a county and a profoundly disabled person for whom it offered case management services, *Caulfield*, 108 Wash.App. at 255, 29 P.3d 738; and a church and the children of its congregation, *see C.J.C.*, 138 Wash.2d at 722, 985 P.2d 262.

dy of BSA. As a result, Plaintiffs fail to state a claim for negligence upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

### 1. *Special Relationship with Scout Leaders*

■ A special relationship imposing a duty to control a third party's criminal and intentional actions requires a "definite, established and continuing relationship between the defendant and the third party." *Taggart v. State,* 118 Wash.2d 195, 219, 822 P.2d 243 (1992) (quoting *Honcoop v. State,* 111 Wash.2d 182, 193, 759 P.2d 1188 (1988)). Further, the defendant must have the actual ability to control the third party's conduct. *See C.J.C.,* 138 Wash.2d at 724, 985 P.2d 262 (1999) ("duty to control does not require agency relationship but arises where the ability to control is present."); *see also Osborn v. Mason County,* 157 Wash.2d 18, 24, 134 P.3d 197 (2006) ("Under the 'special relationship' doctrine, a public entity has a duty to control persons it has authority to control.").

■ *C.J.C.* held that the church had a special relationship with a priest who abuses a member of the congregation because, "[a]s in other agency relationships, a church chooses its officials, directs their activities, and may restrict and control their conduct." 138 Wash.2d at 722, 985 P.2d 262. In contrast, Plaintiffs here do not allege that BSA had the authority to control the actions of the BSA Scout Leaders or that the relationship between the BSA and the individual leaders was of a

definite, established and continuing nature.[2] *Cf. Taggart,* 118 Wash.2d at 219, 822 P.2d 243; *C.J.C.,* 138 Wash.2d at 724, 985 P.2d 262. Plaintiffs, in fact, do not describe the nature of the relationship between the BSA and the scout leaders at all. The court is not bound by Plaintiffs' conclusory statement that "BSA had a special relationship with adult leaders it utilized to work with children, including Plaintiffs whose parents entrusted them to BSA's care," Dkt. # 1 at ¶ 42. *Iqbal,* 129 S.Ct. at 1949–50. Absent additional factual allegations to support this legal conclusion, the Court cannot establish that a special relationship existed between the BSA and scout leaders.

### 2. *Special Relationship with Plaintiffs*

■ Washington recognizes a "special relationship" between a defendant and a foreseeable victim that may give rise to a legal duty to protect the victim from foreseeable criminal acts of third parties in circumstances that are "protective in nature, historically involving an affirmative duty to render aid." *Webstad v. Stortini,* 83 Wash.App. 857, 869, 924 P.2d 940 (Wash.App. Div. 2, 1996) (quoting *Hutchins,* 116 Wash.2d at 228, 802 P.2d 1360; citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 56, at 383 (5th ed. 1984)). In most of these cases, "the party that has been found to have a legal duty was in a position to provide protection … because he or she had control over access to the premises that he or she was obliged to protect." *Lauritzen v.*

---

**2.** The Court rejects Plaintiffs' contention that BSA is estopped from arguing that it does not control its scout leaders. BSA submitted a brief in *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) in which it claimed that it retained the ability to refuse to register scoutmasters that did not meet its leadership standards. BSA can retain control over the registration process while not retaining control over the day to

day activities of scout leaders. *See Glover v. BSA,* 923 P.2d 1383, 1389 n. 3 (Utah 1996) ("[W]e fail to see how the right to discharge on these specific grounds would in any way manifest the BSA's right to control the day-to-day operations of regular troop meetings.") If Plaintiffs wish to allege that BSA had a special relationship with scout leaders it must do so by including the necessary factual allegations in its complaint.

*Lauritzen,* 74 Wash.App. 432, 440–441, 874 P.2d 861 (1994). *See, e.g., Hunt v. King County,* 4 Wash.App. 14, 481 P.2d 593, *review denied,* 79 Wash.2d 1001 (1971) (holding that a hospital owed a disturbed and suicidal patient a "duty to safeguard the patient from the reasonably foreseeable risk of self-inflicted harm through escape"); *Shepard v. Mielke,* 75 Wash. App. 201, 205, 877 P.2d 220 (1994) (holding that convalescent home owed its resident a duty to protect her from criminal actions by visitors where resident "could not lock her door, screen visitors, or generally provide for her own safety" and was at the home "precisely because she was unable to perform these tasks herself."); *Niece v. Elmview Group Home,* 131 Wash.2d 39, 45, 929 P.2d 420 (1997). Thus, Washington imposes a duty to protect another where the other is deprived of his ordinary source of protection—in this case, his parents. *See also Bjerke v. Johnson,* 742 N.W.2d 660, 666 (Minn.2007) (interpreting the Restatement (2d) Torts § 314A as imposing a duty to protect where the defendant "substantially deprived her of a child's primary source of protection—her parents.").

 *C.J.C.* held that a church owes a duty or reasonable care to protect "vulnerable persons *within their custody.*" 138 Wash.2d at 722, 985 P.2d 262 (emphasis added). Relevant to the analysis in *C.J.C.* was the fact that "children of a congregation may be delivered into the custody and care of a church and its workers, whether it be on the premises for services and Sunday school, or off the premises at church sponsored activities and youth camps." *Id.* at 721–22, 985 P.2d 262. Here, Plaintiffs' complaint does not allege that Plaintiffs were in BSA's custody or that BSA had control over the premises when the alleged abuse occurred. Rather, Plaintiffs allege that "[e]nrollment [in BSA] secures parents' and children's commitment to follow a system that encour-

ages parents to entrust their children's health and safety to the BSA" and that the entrustment empowered BSA to secure each child's oath "to adhere to a system that requires children to engage in activities that expose them to adults and others" and "includes over-night outings, camping events, and trips away from parents." *Id.* at ¶ 13. These allegations leave open the possibility that Plaintiffs may have been in BSA's custody for some period of time. However, they fall short of directly alleging that Plaintiffs were in BSA's custody and care at any point. The Court is not bound to accept Plaintiffs' conclusory assertion that "BSA had a special relationship with scouts and other boys, including Plaintiffs, who participated in its programs," Dkt. # 1 at ¶ 41, as true. *Iqbal,* 129 S.Ct. at 1949–50. Absent allegations that Plaintiffs were in the care or custody of the BSA, the Court declines to hold that Plaintiffs were in the kind of special relationship with the BSA that would give rise to a duty to protect the boy scouts from the intentional criminal acts of third parties.

### 3. *Legal Foreseeability*

 Under Washington law, the concept of legal foreseeability—"whether the duty imposed by the risk embraces that conduct which resulted in injury"—is contained within the element of duty. *Mauch v. Kissling,* 56 Wash.App. 312, 318, 783 P.2d 601 (1989). Thus, "[t]he harm sustained must be reasonably perceived as being within the general field of danger covered by the specific duty owed." *Id.* Even if Plaintiffs had adequately alleged the necessary elements to establish that a special relationship existed between BSA and scout leaders or BSA and Plaintiffs, they fail to allege that the harm suffered by Plaintiffs was legally foreseeable.

In *C.J.C.*, the "difficult question" was "whether the harm sought to be prevented fell within the scope of any duty." *Id.* Ultimately, the court determined that the abuse of the plaintiff was legally foreseeable because special relationships existed between the church and both (1) the plaintiff and (2) the priest, (3) there was a "causal connection between Wilson's position in the Church and the resulting harm," and (4) the Church had prior knowledge of "inappropriate sexual conduct by Orin Wilson (the alleged molester of the plaintiffs) toward a young girl." 138 Wash.2d at 720, 985 P.2d 262.

▮▮▮ Even if Plaintiffs had adequately alleged that a special relationship existed between BSA and Plaintiffs and their scout leaders, they have not alleged the fourth factor—that BSA knew or should have known that the individual scout leaders who molested Plaintiffs were likely to do so. Plaintiffs allege that by the time Plaintiffs' were abused, BSA had been made aware of thousands of instances of sexual abuse taking place within their organization. However, Washington has yet to impose liability on a church for the abuse of a member of the congregation at the hands of a church worker absent evidence that the church knew or should have known of that worker's deviant propensities. *See also Doe v. Corporation of President of Church of Jesus Christ of Latter-Day Saints*, 141 Wash.App. 407, 445, 167 P.3d 1193 (2007) (dismissing negligence claim because of lack of causal connection and because "unlike the church in *C.J.C.*, [the LDS church] had not been warned that Taylor had previously abused children or made inappropriate advances towards them."). Given this precedent, this Court is reticent to hold that the BSA could owe a duty to all boy scouts to protect them from sexual abuse at the hands of any scout leader, based solely on generalized knowledge that some proportion of former BSA scout leaders had engaged in inappropriate behavior with other scouts.

Granted, in *Niece*, the Washington Supreme Court held that a group home for the developmentally disabled owed a duty to protect residents from sexual assault by an employee even though the group home had no prior knowledge of the employee's dangerous propensities. 131 Wash.2d at 42, 929 P.2d 420. In doing so, the court determined that a special relationship existed between the group home and the resident plaintiff. *Id.* at 47, 929 P.2d 420 ("Profoundly disabled persons are totally unable to protect themselves and are thus completely dependent on their caregivers for their personal safety."). It then held that plaintiff's sexual assault was legally foreseeable "as long as the possibility of sexual assaults on residents by staff was within the general field of danger which should have been anticipated." *Id.* at 50, 929 P.2d 420. Looking to prior sexual assaults at the facility, an earlier policy against unsupervised contact with residents, expert testimony that such contact was unwise, and legislative recognition of the problem of abuse in residential care facilities, *Niece* held that "sexual abuse by staff at a group home for developmentally disabled persons may be a foreseeable hazard against which reasonable precautions must be taken." *Id.* at 50–51, 929 P.2d 420.

*Niece* suggests that, where a defendant has a certain kind of special relationship with the plaintiff, it may have a duty to protect the plaintiff from sexual assault by a third-party, based solely on the knowledge of a generalized danger of assault. Plaintiffs, however, have not alleged the kind of special relationship present in *Niece*. The profoundly disabled plaintiff in Niece was "completely dependent" on the defendant for her personal safety. *Id.* at 46, 929 P.2d 420. She suffered from cerebral palsy and had profound develop-

mental disabilities including difficulty with mobility and communication. *Id.* at 42, 929 P.2d 420. Plaintiffs do not allege that they were "completely dependent" on BSA for their personal safety when the attacks occurred. The Court is satisfied that Plaintiffs, as children, were unable to protect themselves. *See C.J.C.*, 138 Wash.2d at 726, 985 P.2d 262 (recognizing a strong public policy in favor of protecting children from sexual abuse). However, presumably Plaintiffs had parents or other legal guardians upon whom they were also dependent. Absent specific allegations that Plaintiffs were unable to avail themselves of their ordinary source of protection, and were relying entirely on BSA, specifically, for protection when the abuse occurred, the reasoning of *Niece* is inapposite.

For all of the reasons above, Defendant BSA's Motion to Dismiss Plaintiffs' negligence claims is GRANTED with leave to amend.

## C. Outrage

■ Defendants seek dismissal of Plaintiffs IIED claim on the basis that Plaintiffs' allegations do not satisfy the elements of the claim. To succeed on a claim for outrage or IIED in Washington, a Plaintiff must prove three basic elements: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress. *Rice v. Janovich*, 109 Wash.2d 48, 61, 742 P.2d 1230 (1987) (citing Restatement (Second) of Torts). These elements are factual questions for the jury. However, a trial court faced with summary judgment must first determine "whether reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Strong v. Terrell*, 147 Wash. App. 376, 385, 195 P.3d 977 (2008) (quoting *Robel v. Roundup Corp.*, 148 Wash.2d 35, 51, 59 P.3d 611 (2002)). To survive summary judgment, a claim of outrage must

be predicated on behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Grimsby v. Samson*, 85 Wash.2d 52, 59, 530 P.2d 291 (1975)).

■ Absent allegations that BSA had some specific knowledge that Plaintiffs might be in danger of sexual assault by their scout leaders, BSA's conduct in not warning Plaintiffs of the existence and contents of the IV files, and of failing to take measures to protect the Plaintiffs from abuse, simply does not rise to the level of extreme, outrageous behavior. Further, Plaintiffs have not alleged that they suffered severe emotional distress as a result of BSA's actions, as opposed to the actions of the scout leaders. Accordingly, the Court GRANTS Defendants' motion to dismiss the claim on the tort of outrage.

## D. SECA Violation

Defendant seeks to dismiss Plaintiffs' claim under the Sexual Exploitation of Children Act ("SECA"), RCW 9.68A. Under RCW 9.68A.090, "a person who communicates with a minor for immoral purposes, or a person who communicates with someone the person believes to be a minor for immoral purposes, is guilty of a gross misdemeanor." SECA further provides that "[a] minor prevailing in a civil action arising from violation of this chapter is entitled to recover the costs of the suit." RCW 9.68A.130. Defendants argue that, because Plaintiffs do not allege that the Plaintiffs' scout leader perpetrators were charged with SECA violations, no civil cause of action may be brought for a "violation" of SECA, and therefore attorneys fees cannot be awarded under RCW 9.68A.130. Plaintiffs argue that the term "violation" does not require a charge or conviction under SECA, but only predicate

conduct that would violate the criminal statute.

Only one court has addressed whether RCW 9.68A.130 applies to civil causes of action arising out of conduct for which no criminal charges had been filed. *See Roe v. City of Spokane*, 2008 WL 4619836 (E.D.Wash. Oct. 16, 2008). The Eastern District of Washington observed in *Roe* that, "[n]o Washington or federal decision permits recovery in a civil lawsuit under SECA where no criminal violations have been pursued." Accordingly, it dismissed a SECA claim on summary judgment because no criminal SECA charges had been filed against the alleged perpetrator of sexual abuse in that action. *Id.* at *33–34. On reconsideration, the *Roe* court addressed the argument—sallied here by Plaintiffs—that the term "violation" in RCW 9.68A.130 does not necessarily require that the perpetrator be *charged* or *convicted* of a SECA violation. *See Roe v. City of Spokane*, 2008 WL 4619836 (E.D.Wash. Oct. 16, 2008). Nonetheless, it held that "although it appears that the statute contemplates a right to recovery in a civil action for a violation of the criminal statute, Plaintiffs failed to show a right to recovery on a claim of sexual exploitation of a minor 'based on the facts of this case.'" *Id.* at *5.

Other courts have been more receptive to the interpretation of SECA espoused by Plaintiffs. *See, e.g., J.C. v. Society of Jesus*, 457 F.Supp.2d 1201, 1204 (W.D.Wash. 2006) (declining to decide on the applicability of SECA, but noting that "the [Defendant]'s position that civil liability can arise only after a *conviction* under SECA is inconsistent with the statute's conditioning of liability on a *"violation"* of SECA.") (emphasis in original). *See also Kuhn v. Schnall*, 155 Wash.App. 560, 577, 228 P.3d 828 (2010) (declining to address on appeal whether trial court's application of SECA attorneys' fees provision to sexual abuse case in which no criminal charges had been filed was proper). However, no other court has held as a matter of law that SECA provides a right to recovery in a civil lawsuit where no criminal violations have been pursued.

Given the little guidance available to the Court in deciding whether the attorneys' fees provision of SECA applies to the action before it, the Court declines to decide the issue at this preliminary stage. Plaintiffs must prevail on the underlying action in order to claim attorneys' fees. Should Plaintiffs prevail, the Court will request further briefing on the issue of attorneys fees under SECA at that time.

### E. Civil Conspiracy

██ Civil conspiracy requires (1) two or more people engaged in activity to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means; and (2) an agreement among such people to accomplish the object of the conspiracy. *Wilson v. State*, 84 Wash.App. 332, 350–51, 929 P.2d 448 (1996) (citing *Corbit v. J.I. Case Co.*, 70 Wash.2d 522, 528–29, 424 P.2d 290 (1967)). Defendant BSA moves to dismiss Plaintiffs civil conspiracy for failure to allege the necessary element of *two or more* people engaged in an activity, and for failure to comply with the heightened pleading requirements under Fed.R.Civ.P. 9(b). Plaintiffs do not respond to BSA's argument respecting Plaintiffs' failure to comply with the heightened pleading standard. A court may construe a party's failure to respond to a motion as an admission that the motion has merit. *See* Local Rule CR 7(b). Accordingly, Plaintiffs' civil conspiracy claim is dismissed without prejudice.

### F. Equitable Estoppel, Fraudulent Concealment, and Willful and Wanton Misconduct

Plaintiffs concede that they are not pursuing claims for independent torts of equi-

table estoppel, fraudulent concealment, and/or willful and wanton misconduct. Accordingly, to the extent that these theories and defenses are pled as independent causes of action in Plaintiffs' complaints, these claims are hereby dismissed with prejudice. The Court declines to otherwise rule on the applicability of these theories at this time.

## IV. CONCLUSION

The alleged conduct in Plaintiffs' complaint is egregious and reprehensible. However the complaint lacks the necessary factual predicate for recovery under the well-developed standards imposed by Washington common law. Accordingly, having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendant's Motions to Dismiss (Dkt. # s 6 & 20) is GRANTED with leave to amend. Plaintiffs may file an amended complaint attempting to cure the above deficiencies by **Friday, June 17, 2011.** The amended complaint must carry the same case number as this one. If no amended complaint is timely filed, the Court will dismiss this complaint pursuant to Fed.R.Civ.P. 12(b)(6).

(2) The Clerk is directed to forward a copy of this Order to plaintiffs and to all counsel of record.