**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/walreports/.

FILED
SUPREME COURT
STATE OF WASHINGTON
10/28/2021
BY ERIN L. LENNON
CLERK

# THE SUPREME COURT OF WASHINGTON

| | | |
|---|---|---|
| KATHY ARLENE TURNER, individually and as the Personal Representative of the ESTATE OF KENT ALLEN TURNER, Deceased, | ) ) ) | **ORDER DENYING MOTION FOR RECONSIDERATION** |
| | ) | |
| Appellant, | ) | No. 99243-6 |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON STATE DEPARTMENT OF SOCIAL & HEALTH SERVICES; LEWIS-MASON-THURSTON AREA AGENCY ON AGING; RES-CARE WASHINGTON, INC., a Delaware corporation; and LIFE THERAPEUTIC WORKS, LLC, a Washington Limited Liability Corporation, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Respondents. | ) ) | |
| _____ | ) | |

The Court considered the Appellant's "MOTION FOR RECONSIDERATION", and the

"ANSWER OF RESPONDENT LMTAAA TO MOTION FOR RECONSIDERATION" and

"RESPONDENT WASHINGTON STATE DEPARTMENT OF SOCIAL & HEALTH SERVICES'

ANSWER TO APPELLANT'S MOTION FOR RECONSIDERATION".

Now, therefore, it is hereby

ORDERED:

That the motion for reconsideration is denied.

DATED at Olympia, Washington this 28th day of October, 2021.

For the Court

González, C.J.

CHIEF JUSTICE

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 12, 2021

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 12, 2021

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| KATHY ARLEEN TURNER, individually and as the Personal Representative of the ESTATE OF KENT ALLEN TURNER, Deceased, | ) ) ) ) ) | No. 99243-6 |
| Appellant, | ) ) | |
| v. | ) ) | En Banc |
| WASHINGTON STATE DEPARTMENT OF SOCIAL & HEALTH SERVICES; LEWIS-MASON-THURSTON AREA AGENCY ON AGING; RES-CARE WASHINGTON, INC., a Delaware corporation; and LIFE THERAPEUTIC WORKS, LLC, a Washington Limited Liability Corporation, | ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) ) | Filed: August 12, 2021 |

JOHNSON, J.—This case primarily involves the existence and scope of any

duty owed by the Washington State Department of Social and Health Services

(DSHS) and area agencies on aging (AAAs) to individuals who qualify for and

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99243-6

receive state long-term care services. Kent Turner suffered from multiple sclerosis (MS), which caused loss of his motor skills. When his wife, Kathy Turner,[1] could not, due to her health issues, provide necessary in-home assistance, Kent moved into a nursing home and then into an apartment, where he died in a fire. Kent's estate, through Kathy Turner, sued DSHS and Lewis-Mason-Thurston Area Agency on Aging (LMTAAA)—the AAA with case management responsibilities for Kent's care—for negligence and for abuse or neglect. DSHS and LMTAAA moved for summary judgment, which the trial court granted. The trial court ruled that no special relationship was formed and only an ordinary duty of care was owed. The trial court further held that no breach occurred and causation was lacking. We affirm the trial court's summary judgment dismissal of the claims against DSHS and LMTAAA.[2]

## FACTS AND PROCEDURAL HISTORY

In this case, it is helpful to provide some background on how long-term care is administered and the statutory role of both DSHS and LMTAAA. Long-term

---

[1] When referring to Kent and Kathy Turner, we use their first names for clarification. No disrespect is intended.

[2] The National Council on Independent Living and Advancing States et al., the Washington State Health Care Authority, and the Washington State Association for Justice Foundation all filed amicus briefs in this case.

No. 99243-6

care services are paid in part through Medicaid and are administered by DSHS.[3]

Ch. 74.39 RCW; ch. 74.39A RCW. The statutorily enumerated purposes of long-

term care services include safety and cost, but they also include promoting

"individual choice, dignity, and the highest practicable level of independence."

RCW 74.39A.007(1). In an effort to align promoting choice and independence

with limiting the State's cost, long-term care services offered in community

settings were expanded as an alternative option to services received in institutional

settings. RCW 74.39A.030. The expansion not only allowed the State to save the

costs associated with care received in a nursing facility but also advanced the

dignity and choices of the clients who could receive care in independent living

situations in the community.

DSHS's responsibilities in administering long-term care services are

established by statute and regulation. Summarizing this process, first, a client must

apply for long-term care services by requesting an assessment and submitting a

Medicaid application. WAC 388-106-0025. DSHS is then responsible for

conducting an assessment, advising a client of the appropriate level of care, and

establishing a plan of care based on the assessment in order to facilitate informed

---

[3] Health Care Authority (HCA) is the state agency responsible for administering Medicaid programs. HCA delegates authority to DSHS to administer certain Medicaid programs, including long-term care services at issue in this case. RCW 41.05.021(1)(m)(iii); RCW 74.39A.007.

No. 99243-6

choices by individuals who qualify for long-term care services. RCW

74.42.058(1); RCW 74.39A.040. These assessments are called the Comprehensive

Assessment Reporting Evaluation (CARE assessment), which determine *eligibility*

for long-term care services by evaluating an individual's functional limitations and

ability to perform activities of daily living. WAC 388-106-0045 to -0140.[4] The

assessment decides the level of care the individual is eligible to receive supported

by Medicaid, and the individual must consent to the plan of care developed by

DSHS. RCW 74.39A.040(3); WAC 388-106-0045(3). Given the long-term care

services program's promotion of choice and independence, those receiving long-

term care are provided with considerable control over their care. An individual has

the right to "turn down services[] and not accept case management services," to

"make choices about services you want or don't want," to "[n]ot be forced to

answer questions or do something you don't want to," and to "[t]ake part in and

have your wishes included in planning your care." WAC 388-106-1300(4), (5), (9),

(13).

Once a person qualifies for and is receiving care, DSHS provides individual

case management services for those receiving care in a nursing facility. RCW

---

[4] Relevant to this case, if a client's CARE assessment determines they are functionally eligible for a nursing facility level of care, they may be eligible for long-term care services supported by various programs. *See* WAC 388-106-0310(3)(a), -0277(1). This determination does not necessarily mean that 24-hour care is required and, instead, means that the individual meets a certain functional criteria level. *See generally* WAC 388-106-0355.

4

No. 99243-6

74.42.058. DSHS also contracts with AAAs to provide case management services for those receiving long-term care services in the community. RCW 74.39A.090(2). DSHS must monitor the quality of AAAs, and it is permitted to step in and temporarily provide case management responsibilities if the AAA is not performing its contractual duties. RCW 74.39A.090(3)-(4). AAAs must also develop a care plan for clients based on DSHS's initial care plan, and it must monitor the implementation of the care plan to "verify that it adequately meets the needs of the consumer through activities such as home visits, telephone contacts, and responses to information received by the area agency on aging indicating that a consumer may be experiencing problems relating to his or her home care." RCW 74.39A.095(1)(a), (b). At the time of Kent's death, DSHS could terminate a contract with an individual provider if they threatened the safety or health of a client. *See* former RCW 74.39A.095(7) (2014). DSHS is also authorized to completely terminate a client's long-term services. WAC 388-106-0047(2)-(3).

With that backdrop, this case arises out of Kent's tragic death from a fire in his apartment. Kent was a military veteran who transitioned into work as a police officer and eventually as a correctional facility officer. In 2007, Kent was diagnosed with MS. Three years later, Kent was forced into early disability

5

No. 99243-6

retirement at the age of 48 because his MS progressed to the point where he used a wheelchair and needed assistance with his mobility limitations.

Kathy became Kent's caregiver once he retired, and they lived in an apartment in Olympia. She had to help Kent with many activities of daily living, including bathing, dressing, getting in and out of his electric wheelchair, and using the restroom. Kathy was employed, and while she worked, Kent was able to function in his wheelchair without assistance.

In July 2013, Kathy was diagnosed with squamous cell carcinoma, which required surgery and chemotherapy treatment. Because of her cancer treatment, Kathy knew that she could not continue to provide the needed assistance. Kathy looked into getting in-home care for Kent, but the family was unable to afford it. An application for DSHS assistance was submitted.

On July 31, 2013, DSHS performed an initial CARE assessment to determine Kent's eligibility for long-term care services and to establish a plan of care. The assessment found that Kent's general functional limitations were "[g]eneral weakness, [p]oor hand/eye coordination, [w]eak grip, [l]imited fine motor control." Clerk's Papers (CP) at 830. Based on his limitations, the assessment found that Kent needed assistance with transferring to and from his wheelchair, going to the bathroom, getting dressed, bathing, and doing chores. Once in his wheelchair, Kent was able to independently operate his wheelchair

No. 99243-6

both inside and outside the apartment. The assessment concluded that Kent was eligible for DSHS assistance, and it noted that the planned and recommended living situation was to receive care in a nursing facility. It also noted that Kent's long-term goal was to move back home once Kathy recovered. A service summary for the assessment included a paragraph stating that 24-hour care was available in a residential setting only and that Kent's participation in the long-term care services program was voluntary.[5] Kent signed a service summary with the same language each time an assessment was done.

On August 5, 2013, Kent moved into Puget Sound Healthcare Center (PSHC). About two weeks after he was admitted into PSHC, Kent met with a DSHS nurse facility case manager, Kaya Wilcox. Ms. Wilcox described her role as assisting "people . . . who have a right to discharge and go to a lesser level of care or something that could meet their needs, because it's very expensive to live in a nursing home." CP at 1549. In their initial meeting, Ms. Wilcox confirmed that Kent wanted to stay at PSHC temporarily until he could return home to live with Kathy. Ms. Wilcox followed up with Kent again two months later on October 16,

---

[5] "I am aware of all alternatives available to me and I understand that access to 24-hour care is available only in residential settings, including community residential settings. I agree with the above services outlined in this summary.

- I understand that participation in all ADSA/LTC [(Aging and Disability Services Administration/Long-Term Care)] paid services is voluntary and I have a right to decline or terminate services at any time.
- I understand that I must notify my case manager if I have a change in my living situation."

CP at 855 (boldface omitted).

7

No. 99243-6

2013, and performed another CARE assessment. Her notes reflect a change in Kent's ultimate goal of going from PSHC to his home after Kathy's cancer treatment was over. Instead, Kent's goal now stated that he wanted to discharge from PSHC.[6] The assessment stated that Kent's planned and recommended living situation was to receive care "In Home." CP at 495. Kent was determined to be eligible for 158 hours of in-home care per month by his original CARE assessment.

A plan was developed to facilitate Kent's discharge from PSHC, and Kent was qualified for Roads to Community Living (RCL), which is a federally funded program designed to help people transition from institutional settings and into the community. Kent's CARE assessment from October 16, 2013 qualified him for this program. He signed a participation form for the RCL program on that date in addition to a waiver of nursing home care services, which states, "I have been informed of my service options and I choose to receive services under the following Home and Community based waiver instead of nursing home care." CP at 2168. Under the RCL protocols, Washington requires that the plan of care contain an evacuation plan. *See also* WAC 388-101D-0170(c) (services providers must develop and practice an evacuation with clients). In the locomotion portion of

---

[6] More specifically, the notes state that "going to an [assisted living] from the [skilled nursing facility] with an ultimate goal of going home or possibly getting his own apartment would be a plan he could support." CP at 865.

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99243-6

Kent's CARE assessments, the evacuation plans stated that his caregiver would keep the walkways clear, recharge his wheelchair batteries, and help him in evacuating. The two CARE assessments done after his initial CARE assessment found that Kent's evacuation capability for an adult family home was independent, which means that Kent could use his wheelchair to exit.

DSHS then contracted with Life Therapeutic Works (LTW) to help Kent find an appropriate community placement. On December 4, 2013, Kent told Ms. Wilcox he wanted to live in an independent living situation, rather than in an adult family home or assisted living situation. Kent signed another RCL participation form at that time. Kent went through a number of capability assessments by an occupational therapist, which found that he met the expectations in his abilities to perform activities and therefore could live with modified independence. LTW discussed and showed Kent various apartment options, and he ultimately applied and was approved for an apartment unit at Capitol House Apartments on January 30, 2014. He moved into the apartment on February 18, 2014.

On February 21, 2014, Kent was assessed by a registered nurse, a physical therapist, and an occupational therapist, and it was found that he needed no further therapy. The nurse also noted that no structural barriers, safety hazards, or sanitary issues existed in the apartment. Ms. Wilcox also conducted an interim CARE assessment on February 28, 2014, which confirmed Kent's eligibility for in-home

9

care of 158 hours per month, outlined the services he was supposed to be receiving, and provided an evacuation plan.

On March 17, 2014, DSHS transferred case management responsibilities to LMTAAA. Kent's case manager was Heidi Hildebrandt. She met with Kent on March 26, 2014 to review the services being provided to him, and they both signed the service summary. ResCare provided Kent's in-home care for two hours in the morning and two hours in the evening. On March 31, another resident of Capitol House Apartments reported that Kent was losing weight, that his wheelchair battery was not being charged, and that it appeared he had not showered. No investigation was made.

On April, 30, 2014, tragically, Kent died alone in his apartment from a fire. While the apartments had a fire alarm system that notified first responders, the apartment did not have sprinklers. Kent was found in front of the door in his wheelchair, and it appeared that the fire was primarily isolated to his person, as the wheelchair had not moved once the fire started. Because a majority of the fire was under the wheelchair, the fire department concluded that the fire was probably started either on the wheelchair or on Kent. The coroner's report and the autopsy

No. 99243-6

report concluded that Kent's death was accidental and a result of inhaling toxic materials from the fire. It remains unclear what actually caused the fire.

On October 14, 2015, Kent's estate, through Kathy, brought suit against DSHS, alleging negligence and for abuse and neglect. The complaint was amended twice, adding claims against ResCare, LTW, and LMTAAA as defendants. The complaint alleged that DSHS breached its duty to Kent by failing to conduct adequate assessments, to provide appropriate services, to place him in a safe environment, and to comply with policies and regulations. The complaint also alleged that LMTAAA negligently performed its case management responsibilities. It alleged that LMTAAA breached its duties by not placing Kent in a safe environment with safe caregivers, and by not complying with regulations and internal policies. The complaint further alleged that DSHS and LMTAAA breached a duty to investigate a complaint that Kent was not receiving adequate care in his apartment.

All defendants moved for summary judgment, and the trial court granted summary judgment in favor of all defendants.[7] Regarding DSHS and LMTAAA, the trial court concluded that both parties were not in a special relationship to Kent and therefore owed him only an ordinary standard of care. It concluded that the

---

[7] Three manufacturers of Kent's wheelchair were also sued, including Curtis Instruments, Inc., Pride Mobility Products Corporation, and United Seating and Mobility, LLC, which were dismissed and not before us.

11

No. 99243-6

undisputed facts established no breach of that duty. The trial court further concluded that proximate cause was not met, especially in light of the uncertainty surrounding the fire causing Kent's death. Finally, the trial court dismissed the claims of abuse or neglect under chapter 74.34 RCW. Kathy appealed, and we accepted certification for direct review.

## ANALYSIS

### I. Standard of Review

We review orders granting summary judgment de novo. Summary judgment is appropriate where there is no genuine issue as to any material fact, so that the moving party is entitled to judgment as a matter of law. We view the facts in a light most favorable to the nonmoving party. To prevail on a negligence claim, a plaintiff "'must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury.'" *Ehrhart v. King County*, 195 Wn.2d 388, 396, 460 P.3d 612 (2020) (internal quotation marks omitted) (quoting *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 429, 378 P.3d 162 (2016)). In this case, the primary issues relate to the existence and scope of any duty owed under these facts by DSHS and LMTAAA to Kent. The existence and scope of a duty is a threshold inquiry in a negligence action, and it is a question of law we review de novo. *Munich v. Skagit Emergency Commc'ns Ctr.,* 175 Wn.2d 871, 877, 288 P.3d 328 (2012).

12

No. 99243-6

II.    DSHS's Duty of Care

While the claims asserted against DSHS and LMTAAA share some arguments in common, the briefing demonstrates that the factual basis of those claims are somewhat distinct. The claim against DSHS relies most heavily on the existence of a special relationship between DSHS and Kent leading up to his move into Capitol House Apartments. Appellant, Kathy Turner, essentially argues that DSHS was in a special relationship to Kent because it "encouraged Kent to make such a move, largely for financial reasons." Br. of Appellant at 6-7. Appellant points to statements from Ms. Wilcox, Kent's nurse facility case manager, that the RCL program saved the State money, attempting to cast her actions in asking Kent if he wanted to move as bordering on predatory type behavior. Reply Br. of Appellant at 3 ("DSHS *actively* recruited people with disabilities to leave [skilled nursing facilities] . . . in order to cut costs"), 4 (arguing that DSHS worked toward its "'targeting and recruitment' goals by aggressively approaching new admittees to [skilled nursing facilities]"). Because Kent's initial plan was to receive care in a nursing facility temporarily until he returned to Kathy, appellant argues that Kent's move was entirely based on DSHS's recommendations and guidance, and that "DSHS, in its blind adherence to transition of disabled persons to community settings in the guise of 'client choice,' washed its hands of any real responsibility

13

No. 99243-6

for Kent's placement in a facility that jeopardized him." Br. of Appellant at 24 (citation omitted).

Appellant therefore argues DSHS breached its special protective duty to Kent by allowing him to move into an assisted independent living situation, arguing that if the State had kept him in a nursing care type facility, Kent's death would not have occurred.[8] Assuming for summary judgment purposes that appellant's description of DSHS's involvement in Kent's move may be true to a certain extent, it does not necessarily establish a special relationship existed. Instead, the record establishes, as provided by the statutory framework for the administration of long-term care services, that Kent had control over the decision to live more independently or to stay at a nursing facility, that Kent fully participated in that choice, and that DSHS's role was to provide information and assist Kent in carrying out that choice. RCW 74.42.058(1) ("The purpose of the case management services is to assist residents and their families to assess the appropriateness and availability of home and community services that could meet

---

[8] Interestingly, this argument as to the existence of a special relationship based on DSHS encouraging Kent to move was not the appellant's sole focus of the duty analysis at oral argument. Instead, appellant presented a somewhat different and new theory regarding DSHS's breach of duty by arguing DSHS did not obtain Kent's informed consent because it did not adequately discuss the risks associated with moving into the community despite its knowledge that Kent overestimated his abilities. Wash. Supreme Court oral argument, *Turner v. Dep't of Soc. & Health Servs.*, No. 99243-6 (March 11, 2021), at 5 min., 56 sec. through 7 min., 10 sec.; 17 min., 6 sec. through 18 min., 56 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. This theory was not raised in any of appellant's briefing on appeal or at the trial court, and it does not change our ultimate analysis in this case.

14

the resident's needs so that the resident and family can make informed choices.").

DSHS did not have complete control over the living options nor did it make the

ultimate decision for Kent to leave PSHC.

While it is also true that Kent needed assistance, once he was placed in his

wheelchair, he was able to operate it independently. Given Kent's level of care and

independence, the relationship between Kent and DSHS did not rise to the level of

a special relationship, and our cases have drawn this distinction.

The special relationship alleged by appellant is defined by *Restatement*

*(Second) of Torts* § 315 (Am. Law Inst. 1965):

> There is no duty so to control the conduct of a third person as to
> prevent [them] from causing physical harm to another unless
>        (a) a special relation exists between the actor and the third
> person which imposes a duty upon the actor to control the third
> person's conduct, or
>        (b) a special relation exists between the actor and the other
> which gives to the other a right to protection.

The special relationship in *Restatement (Second)* § 315(b) recognizes a heightened

duty to protect someone from foreseeable harms. A special relationship results in a

heightened duty where a person is helpless, totally dependent, or under the

complete control of someone else for decisions relating to their safety. Our cases

have identified the relationships resulting in such a protective duty "include the

relationships between schools and their students, innkeepers and their guests,

common carriers and their passengers, and hospitals and their patients." *H.B.H. v.*

15

No. 99243-6

*State*, 192 Wn.2d 154, 169, 429 P.3d 484 (2018). The protective duty imposed by the special relationship is "limited by the concept of foreseeability," where a duty is imposed "[o]nly if a reasonable person in the defendant's position would be aware of a 'general field of danger' posing a risk to one such as the plaintiff." *H.B.H.*, 192 Wn.2d at 176-77 (quoting *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 50, 929 P.2d 420 (1997)). If a special relationship is formed, it has an accompanying "duty of care to protect the plaintiff from foreseeable harm," which borders on strict liability. *H.B.H.*, 192 Wn.2d at 169.

First, it is necessary to discuss the nature of this relationship as applied to DSHS in addition to establishing the duty owed. Our cases discussing the formation of a special relationship with DSHS recognize a special relationship is based on an element of entrustment. For example, we considered DSHS's special relationship to foster children in *H.B.H.*, where former foster children sued DSHS and alleged that DSHS was negligent in failing to protect them from child abuse occurring in their foster placements. Citing *Caulfield v. Kitsap County*, 108 Wn. App. 242, 29 P.3d 738 (2001), we reasoned that DSHS's role in placing foster children in foster homes was similar to its role in placing vulnerable adults with contractual caregivers. Both roles "carry out the State's parens patriae responsibilities." *H.B.H.*, 192 Wn.2d at 171. Rather than physical custody or control, vulnerability and "entrustment for the protection of a vulnerable victim . . .

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99243-6

is the foundation of a special protective relationship," which other sections of *Restatement (Second)* further outlining the special relationship confirmed.[9] *H.B.H.*, 192 Wn.2d at 173. We ultimately concluded that DSHS stood in a protective relationship because it was the legal custodian of foster children with statutory duties to investigate reports of abuse or neglect and monitor foster care placements.

While we have not analyzed DSHS's relationship to vulnerable adults, two Division Two Court of Appeals decisions have. The first is *Caulfield*, which involved an adult with MS who required 24-hour care. Caulfield was initially placed in a nursing facility, and his care was monitored by a DSHS case manager. DSHS concluded that Caulfield was eligible for in-home care. DSHS contracted directly with Caulfield's caregiver who provided him 24 hour in-home care. Caulfield complained to his DSHS case manager about his caregiver, and the case management responsibilities for Caulfield's care were transferred to a Kitsap County social worker. Caulfield was hospitalized with severe injuries and illnesses, and he sued Kitsap County, DSHS, and the caregiver, claiming negligent care from his in-home placement. A jury found the county and the caregiver negligently caused Caulfield's injuries. The county appealed and argued that it owed no duty

---

[9] Specifically, we considered the special relationship resulting from "'[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.'" *H.B.H.*, 192 Wn.2d at 171 (alteration in original) (quoting RESTATEMENT (SECOND) § 314A(4)).

17

No. 99243-6

to Caulfield under the public duty doctrine. The Court of Appeals disagreed, and it reasoned that the special relationship defined by *Restatement (Second)* § 315(b) applied to the county. The court concluded that the county case manager stood in a special relationship to Caulfield based on a total inability to care for himself, which created an "element of 'entrustment.'" *Caulfield*, 108 Wn. App. at 256. The court noted that "[p]rofoundly disabled persons are totally unable to protect themselves and are thus completely dependent not only on their caregivers but also their case managers for their personal safety." *Caulfield*, 108 Wn. App. at 255-56. The extensive responsibilities of county case managers established a duty to use reasonable care to protect Caulfield from harm caused by his caregiver.

The second Court of Appeals case, *Donohoe v. State*, 135 Wn. App. 824, 142 P.3d 654 (2006), presents a contrasting factual scenario where the court concluded a special relationship was not formed. That case involved an adult who needed 24-hour care due to her dementia, incontinence, and risk of falling. Donohoe initially lived in an adult family home privately paid for by her family. DSHS assessed Donohoe and found her eligible for DSHS assistance. Donohoe chose to receive her care in a nursing home, Pacific Care. DSHS received two complaints from Donohoe's family about Pacific Care's caregiving, and DSHS cited Pacific Care's failure to provide adequate personal hygiene. Donohoe was moved to a hospital shortly before the second complaint. Donohoe's family then

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

moved her to another private nursing home, where she died about a year later. Donohoe's estate sued DSHS. DSHS's motion for summary judgment argued that it owed no duty to Donohoe, relying on the public duty doctrine. The Court of Appeals reasoned that no special relationship between Donohoe and DSHS existed, and it distinguished *Caulfield*. Unlike *Caulfield*, where a DSHS case manager hired and monitored Caulfield's sole caregiver, the court noted that DSHS did not select or oversee the care Donohoe was receiving at Pacific Care and that Donohoe's family, not DSHS, chose Pacific Care and ultimately removed her. At bottom, Caulfield's differing special relationship was created by DSHS being solely responsible for monitoring Caulfield's in-home caregiver. In contrast, DSHS's primary responsibilities as to Donohoe were determining Medicaid and nursing home eligibility.

*H.B.H.* concluded DSHS's relationship to vulnerable adults involves an element of entrustment similar to its relationship to foster children. Pursuant to that reasoning, DSHS and AAAs may be in a special relationship to adults receiving in-home care when either entity monitors an individual's care to the extent that the individual completely entrusts them with their safety. Here, the trial court concluded that there was no special relationship between Kent and DSHS or LMTAAA and distinguished *Caulfield* because Kent was not under 24-hour care.

No. 99243-6

While Kent required a certain amount of assistance due to his functional limitations, independent assessments determined that he did not require 24-hour care in a nursing facility. As a result, Kent could choose to receive care independently with partial assistance. And when given that option, Kent chose to move out of PSHC and live more independently, and he accepted certain risks associated with moving out of a nursing facility with 24-hour care available. Given Kent's ability to live independently with partial assistance combined with his choice to receive his care in that living situation, Kent's relationship with DSHS does not fit under our cases developed outlining the nature of a special relationship. Unlike *Caulfield*, Kent was not helpless, totally dependent, or under the complete control of DSHS for decisions relating to his safety at his apartment given his level of independence.

We affirm the trial court's ruling that no special relationships existed under these facts. Rather than a special relationship stemming from monitoring Kent's care at his apartment, appellant essentially alleges that a special relationship existed because DSHS allowed Kent to move from the safe environment of a nursing facility into an apartment with lesser care available. Reply Br. of Appellant at 6 (describing DSHS as "ushering him out of the [skilled nursing facility] into an inappropriate, unsafe setting and care plan that did not meet his needs"). According to appellant, DSHS was entrusted with Kent's safety based on that move.

No. 99243-6

But imposing a special relationship based on Kent's move runs contrary to the client-centered approach of long-term care services. Kent was ultimately the decision-maker regarding his placement and care. RCW 74.42.058(1); WAC 388-106-1300. It was Kent's choice to live independently, albeit with partial assistance. In fact, he signed RCL participation forms confirming his voluntary entry into that program in addition to a waiver of nursing home care services, which stated that he chose to receive services in the community. If DSHS were to limit the ability of institutionalized clients to move into independent living when, as occurred in this case, professionals determine the client can receive care in such a setting, then it could run the risk of discriminating based on disability.[10] DSHS's statutory role in determining eligibility for long-term care services is to facilitate client choice and independence in how they will receive care. Although the State may have a financial incentive in moving institutionalized clients back into the community, that incentive is aligned with the client when a client, such as Kent, is seeking that type of placement. The element of entrustment necessary for a special relationship

---

[10] Br. of Nat'l Council on Independent Living et al., as Amici Curiae at 7-15 (discussing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999), and the possible discrimination implications of finding liability based on Kent's move). We have also expressed our respect for and deference to the choice to not receive care in institutionalized settings in the context of guardianships. *Raven v. Dep't of Soc. & Health Servs.*, 177 Wn.2d 804, 819-22, 306 P.3d 920 (2013). In *Raven*, we held that a guardian's decision to not place her ward in a nursing home could not constitute neglect because the ward expressed her desire to not go into such a facility when competent. We reasoned that guardians could not move their wards into such settings against their will because RCW 11.92.190 prohibits residential treatment facilities from detaining a person unless pursuant to an involuntary commitment proceeding.

21

does not exist when a client decides to move into the community because this would conflict with the primary statutory goals of choice and dignity of independent living advanced by the long-term care services program. RCW 74.39A.007(1). Imposing liability based on that choice could put the long-term care services program at risk because DSHS may become more hesitant in its community placement efforts.[11]

We conclude that Kent's choice to move was an insufficient basis to establish the element of entrustment necessary for a special relationship and that, as a result, DSHS owed no duty to protect Kent from foreseeable harms. DSHS's relationship with Kent also does not involve complete dependence or control required for a special relationship to exist.

Next, appellant argues that an associated special relationship formed based on express assurances made by DSHS. Br. of Appellant at 44. A duty can exist under this exception where "(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) give rise to justifiable reliance on the part of the plaintiff." *Taylor v. Stevens County,* 111 Wn.2d 159, 166, 759 P.2d 447 (1988). In *Caulfield*, the court concluded that this type of special relationship existed because DSHS had direct contact with

---

[11] *See* Wash. State Health Care Auth.'s Amicus Curiae Br. at 11-15.

No. 99243-6

Caulfield, the DSHS case manager gave Caulfield express assurances that they would provide "case management and crisis intervention," and Caulfield justifiably relied on those assurances. 108 Wn. App. at 252.

In contrast, in *Donohoe*, the court distinguished *Caulfield* because DSHS had not promised Donohoe that it would ensure Pacific Care's adequate care. Like *Caulfield*, DSHS provided case management responsibilities to Kent, but it passed that responsibility to LMTAAA once he was moved into his apartment. Nevertheless, neither case management responsibilities nor CARE assessments create an express assurance that Kent would be safe from all harms related to his apartment living. Kent could not reasonably rely on any assurances to keep him completely safe from all harm. And Kent repeatedly signed service summaries that stated he was "aware of all alternatives available to me and I understand that access to 24-hour care is available only in residential settings" and that "participation in all ADSA/LTC paid services is voluntary and I have a right to decline or terminate services at any time." CP at 855. We conclude that no special relationship existed based on express assurances by DSHS.[12]

_____

[12] To the extent appellant argues that a special relationship existed based on LMTAAA's case management responsibilities, we conclude no special relationship existed. LMTAAA's oversight of the amount of care received did not include an element of entrustment for Kent's complete safety, and LMTAAA gave no assurance to keep Kent safe from all harm.

23

No. 99243-6

Appellant further argues DSHS owed a duty under *Restatement (Second)* §§ 323[13] and 324[14] by voluntarily undertaking services to Kent that were necessary for his protection. Br. of Appellant at 19-21.[15] Appellant argues that this duty arises from DSHS offering Kent participation in the RCL program and conducting assessments to determine Kent's eligibility in that program. Br. of Appellant at 19-21.

We have considered these sections of *Restatement (Second)* in cases involving the voluntary rescue doctrine. For example, in *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 545 P.2d 13 (1975), we analyzed the voluntary rescue doctrine in the context of a State agent's representations relating to the risk of avalanche. First, we noted that "[o]ne who undertakes, albeit gratuitously, to render aid to or

---

[13] "One who undertakes, gratuitously or for consideration, to render services to another which [they] should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from [their] failure to exercise reasonable care to perform [their] undertaking, if
"(a) [their] failure to exercise such care increases the risk of such harm, or
"(b) the harm is suffered because of the other's reliance upon the undertaking."

[14] Section 324 of *Restatement (Second)* is a specific application of section 323 and it states: "One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect [themselves] is subject to liability to the other for any bodily harm caused to [them] by
"(a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
"(b) the actor's discontinuing his aid or protection, if by so doing [they] leave[] the other in a worse position than when the actor took charge of [them]."

[15] These sections of *Restatement (Second)* were not raised below, and DSHS argues that we should therefore not consider them. RAP 2.5(a); RAP 9.12. However, because these sections of *Restatement (Second)* involve an exception to the public duty doctrine, and because the record has been developed to consider this issue, we reach this issue. RAP 2.5(a).

24

No. 99243-6

warn a person in danger is required by our law to exercise reasonable care in [their] efforts." *Brown*, 86 Wn.2d at 299. A rescuer is then liable to the person they are intending to assist if they "fail[] to exercise such care and consequently increase[] the risk of harm." *Brown*, 86 Wn.2d at 299. Under this theory, we first explained that a duty arises where the State agent received word from an expert that there was an avalanche danger but negligently misrepresented that danger, causing the plaintiffs harm when they refrained from getting help elsewhere. We further held that a duty to warn may be imposed pursuant to "promises which induce reliance, causing the promisee to refrain from seeking help elsewhere and thereby worsening [their] situation." *Brown*, 86 Wn.2d at 300.

In *Folsom*, we highlighted that the rescue doctrine can apply where the rescuer knows a danger is present. *Folsom v. Burger King*, 135 Wn.2d 658, 676, 958 P.2d 301 (1998). In that case, the estates of two Burger King employees argued that a security company owed a duty to rescue them from a robbery and murder where a security system was left in place after its security contract was terminated. We disagreed and stated that "[t]he duty to rescue arises when a rescuer knows a danger is present and takes steps to aid an individual in need." *Folsom*, 135 Wn.2d at 677. Because leaving the system in place occurred before any danger was present, we held no duty to rescue was implicated.

25

No. 99243-6

We conclude that these facts do not implicate the voluntary rescue doctrine. As stated in *Folsom*, the premise of the voluntary rescue doctrine is that the rescuer, in this case evidently DSHS, undertakes or promises to undertake to rescue the plaintiff from a *known* danger. In this case, DSHS did not provide an assessment and outline a care plan *because* it knew of the danger posed by moving Kent into an apartment.[16]

## III.  Duty of Ordinary Care

We next recognize, as the trial court did, that appellant raises a distinct theory of the duty of ordinary care owed. This duty arises primarily from LMTAAA's case management responsibilities in monitoring the in-home care Kent was receiving. LMTAAA was required to monitor Kent's caregiver, ResCare, to ensure that the assistance Kent received as outlined in his care plan, such as bathing, dressing, and placing Kent in his wheelchair, was being adequately carried out. RCW 74.39A.095(1)(b). "'[I]n general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable [person] to protect them against an unreasonable risk of harm to them arising out of the act.'" *Robb v. City of Seattle*, 176 Wn.2d 427, 436, 295 P.3d 212 (2013) (quoting RESTATEMENT (SECOND) § 302 cmt. a). Furthermore, "[t]he actor is negligent if [they]

---

[16] We also reject any suggestion that the voluntary rescue doctrine would apply to LMTAAA because LMTAAA similarly did not provide case management services based on the dangers associated with Kent's apartment.

No. 99243-6

intentionally create[] a situation, or if [their] conduct involves a risk of creating a situation, which [they] should realize as likely to be dangerous to others in the event of such customary or normal act or operation." RESTATEMENT (SECOND) § 302 cmt. d. As the trial court seemed to acknowledge, no apparent dispute exists in this case that LMTAAA owed a duty of ordinary care. But the scope of that duty was limited to reasonably monitoring Kent's care and ensuring the care plan was being followed.

Appellant argues the trial court erred in granting summary judgment because whether DSHS and LMTAAA breached a duty and proximately caused Kent's death are jury questions. Br. of Appellant at 45-48. Breach and proximate cause are normally issues decided by the jury, but they may be determined as a matter of law when "reasonable minds could not differ" on whether those elements exist. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

Here, the trial court found no facts supporting breach or proximate cause. The appellant's briefing is sparse in addressing that portion of the trial court's ruling, and we are not convinced that the trial court's ruling was incorrect. DSHS transferred case management responsibilities to LMTAAA before Kent's death. While LMTAAA had a duty to reasonably monitor Kent's care, Kent's injury did not result from LMTAAA's fault in monitoring his care because his injury was not

27

related to the in-home care he was receiving. We agree with the trial court's ruling that LMTAAA did not breach any duty of ordinary care that caused Kent's death.

As argued in appellant's complaint and the supporting pleadings, DSHS's alleged duty to Kent primarily stems from the formation of a special relationship with Kent based on his transition into independent living, which we have rejected as a basis for a heightened duty of protection in this case. Appellant articulates DSHS's duty of ordinary care in her opposition to defendants' motions for summary judgment as similarly arising out of Kent's transition to Capitol House Apartments. *See, e.g.*, CP at 1326, 1329 (appellant arguing that "DSHS was negligent in assessing and supervising decedent Kent Turner's care at the Capitol House Apartments when they placed him in independent housing that failed to meet his care needs" and owed a "duty to take reasonable care in making the transition to ensure that Kent's new living situation was reasonable for him"). Appellant's argument therefore merges DSHS's duty of ordinary care with its heightened duty of a protection from a special relationship, thereby blurring any distinction between these duties. And again, DSHS did not "place" Kent in an apartment; it merely assessed him and found that Kent could live independently with modified assistance, which allowed Kent to choose to receive his care in an apartment rather than a nursing facility. Therefore, to the extent that DSHS owed a duty of ordinary of care, DSHS's duty of ordinary care as argued by appellant

28

No. 99243-6

encompassed a responsibility to properly assess whether Kent qualified for long-term care services received independently. Appellant does not point to the inadequacy of any independent assessment DSHS relied on, and Kent's ultimate injury did not arise from an independent assessment as to his ability to live independently. The dissent emphasizes appellant's other peripheral arguments as to DSHS's breach of the ordinary duty of care, such as Kent's evacuation plan and the provision of a personal emergency response device. *See* dissent at 4-7. However, these arguments are likewise not sufficiently separated from the argument that a special relationship existed when DSHS allegedly "placed" Kent in an apartment.

IV.    Implied Cause of Action

Appellant also argues that we should imply a cause of action against DSHS and LMTAAA based on their statutory responsibilities in providing and managing long-term care services under chapter 74.39A RCW. Br. of Appellant at 28-36.[17] DSHS contends that it owes no specific duty to Kent that it does not owe to the

---

[17] Appellant cites the following statutes and regulations relating to DSHS: RCW 74.39A.090(4)(a) (monitoring AAA performance); WAC 388-106-1980 (outlining when DSHS can terminate services); WAC 388-101D-0170(c) (evacuation plan must be developed and practiced with a client). Appellant also cites the following statutes and regulations relating to AAAs: RCW 74.39A.090(4)(a) (assessing the quality of in-home care); RCW 74.39A.095(1)(b) (monitoring the implementation of the care plan to ensure it meets the needs of the client). Finally, appellant cites a statute at the time of Kent's death that allowed an AAA or DSHS to terminate an individual provider if safety was an issue. Former RCW 74.39A.095(7).

29

No. 99243-6

public under chapter 74.39A RCW because this issue was unpreserved[18] or because the public duty doctrine applies. Corrected Br. of Resp't DSHS at 29-41. An implied statutory cause of action analysis is related to the public duty doctrine because it similarly asks whether a statute or regulation creates an actionable duty. *Ehrhart*, 195 Wn.2d at 400 n.6.

In considering whether to imply a cause of action based on statutory provisions, we utilize a three-part test derived from federal cases and consider "first, whether the plaintiff is within the class for whose 'especial' benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation." *Bennett v. Hardy*, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990). In *Bennett*, we concluded that RCW 49.44.090, which made age discrimination an unfair employment practice, created an implied cause of action. First, the plaintiffs were within the age group that the statute was enacted to protect, so they met the first part of the test. Second, we relied "on the assumption that the Legislature would not enact a statute granting rights to an identifiable class without enabling members of that class to enforce those rights." *Bennett*, 113 Wn.2d at 921. Finally, we concluded that the purpose of

---

[18] Although this issue is not preserved, we reach it because the primary negligence alleged arises out of DSHS and LMTAAA's statutory duties pursuant to chapter 74.39A RCW. RAP 2.5(a).

30

No. 99243-6

the statute—prohibiting age discrimination by employers—was furthered by implying a cause of action for those experiencing employment discrimination based on age.

We refuse to imply a cause of action here based on any of the monitoring responsibilities in chapter 74.39A RCW. DSHS persuasively argues that we have consistently declined to imply a cause of action based on public assistance statutes like chapter 74.39A RCW, which benefit the public at large rather than a specific class. Corrected Br. of Resp't DSHS at 39-43. DSHS further argues that no legislative intent supports creating a cause of action given that the statute and regulations create enforcement remedies for both DSHS and clients. Finally, DSHS highlights that implying a cause of action is inconsistent with DSHS's administration of long-term care services and with the statute's purpose of promoting client choice and independence. We agree with the State's arguments.

In *Keodalah,* we considered whether to imply a cause of action based on a good faith provision of a Washington insurance statute, RCW 48.01.030, and we highlighted that the first *Bennett* factor "is not met if the statute in question benefits the general public rather than an identifiable class of persons." *Keodalah v. Allstate Ins. Co.*, 194 Wn.2d 339, 346, 449 P.3d 1040 (2019). We concluded that the insurance statute was not enacted for the especial benefit of insureds because it expressly stated it was concerned with public interest and the "'integrity of

31

insurance'" generally. *Keodalah*, 194 Wn.2d at 347. The quality of long-term care services and the vulnerability of adults like Kent is discussed in the findings and the purpose and intent sections of the statute. RCW 74.39A.005, .007. However, the statute is also concerned with the broader public interest. RCW 74.39A.005 (stating that the "public interest would best be served by a broad array of long-term care services"). While chapter 74.39A RCW governs DSHS and LMTAAA's responsibilities toward the class of vulnerable adults, the public interest language emphasizes that this is a public assistance statute that does not meet the first *Bennett* factor.

The legislative intent does also not support creating a remedy. Appellant argues that the "sheer extent of the specific protective provisions . . . and implementing regulations" could not have been created without a corresponding remedy. Br. of Appellant at 33. However, DSHS and LMTAAA's statutory responsibilities relate to the safe administration of long-term care services and should not be considered rights that do not have an accompanying remedy. The statute specifically commands that DSHS seek enforcement remedies where providers are failing to safely provide care. RCW 74.39A.051(6). DSHS may take enforcement action in response to noncompliance or violations. RCW 74.39A.080. At the time of Kent's death, the statute also authorized DSHS and LMTAAA to terminate contracts with providers in the event of inadequate or harmful

32

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

performance. Former RCW 74.39A.095(7). Finally, clients may seek a hearing if they disagree with a CARE assessment and eligibility determination regarding the amount of care they are entitled to receive. WAC 388-106-1305. To imply a cause of action "when the Legislature has provided an adequate remedy in the statute" would be inconsistent with *Bennett*. *Cazzanigi v. Gen. Elec. Credit Corp.,* 132 Wn.2d 433, 445, 938 P.2d 819 (1997).

Even if we view these remedies as insufficient, allowing private cause of action against DSHS would be inconsistent with the statute's purpose. In *Braam*, where we considered an implied cause of action against DSHS based on its statutory requirements relating to foster children, the court found that a private cause of action would be "inconsistent with the broad power vested in DSHS to administer these statutes." *Braam v. State*, 150 Wn.2d 689, 712, 81 P.3d 851 (2003). Similarly here, where the statute relies heavily on DSHS for proper administration, it would be inconsistent with legislative purpose to find an implied cause of action. An implied cause of action would be further inconsistent with the statute's purpose of promoting "individual choice, dignity, and the highest practicable level of independence." RCW 74.39A.007(1). If we implied a cause of action based on DSHS and LMTAAA's case management and discharge of Kent, it could conflict with the statutory goal of allowing vulnerable adults the choice to live in the independent settings. We decline to imply a cause of action against

33

No. 99243-6

DSHS under chapter 74.39A RCW because (1) the statute is a public assistance statute, (2) the legislative history does not evidence an intent to create a private cause of action, and (3) it would be inconsistent with the statute's purpose.[19]

V.    Abuse of Vulnerable Adults Act (AVAA), Ch. 74.34 RCW

Finally, appellant argues that the trial court erred in dismissing her private cause of action for abuse or neglect against DSHS and LMTAAA pursuant to RCW 74.34.200(1). That section provides a cause of action for damages for injuries and pain and suffering for "a vulnerable adult who has been subjected to abandonment, abuse, financial exploitation, or neglect either while residing in a facility or in the case of a person residing at home who receives care from a home health, hospice, or home care agency, or an individual provider." RCW 74.34.200(1). However, the cause of action limits the parties who may be sued:

> This action shall be available where the defendant is or was a corporation, trust, unincorporated association, partnership, administrator, employee, agent, officer, partner, or director of a facility, or of a home health, hospice, or home care agency licensed or required to be licensed under chapter 70.127 RCW, as now or subsequently designated, or an individual provider.

---

[19]Appellant also argues, as she did at summary judgment, that chapter 74.39A RCW creates an actionable duty under the legislative intent exception to the public duty doctrine. Br. of Appellant at 44; Reply Br. of Appellant at 17. The legislative intent exception involves an inquiry similar to implied causes of action by asking whether the statute "enacts legislation for the protection of persons of the plaintiff's class." *Taylor*, 111 Wn.2d at 164. The argument as to this exception is not sufficiently developed to warrant additional analysis. Thus, we conclude the legislative intent exception to the public duty doctrine does not apply for the same reasons as the analysis for the implied cause of action.

34

RCW 74.34.200(1).

DSHS and LMTAAA correctly point out that this cause of action does not apply to them. DSHS is not named in the statute, and, in fact, it is responsible for investigating reported abuse or neglect. RCW 74.34.067-.068. Moreover, another portion of the AVAA allows DSHS to seek an order of protection on behalf of a vulnerable adult for abuse or neglect but expressly states that DSHS is not liable for failing to do so. RCW 74.34.150. This supports the conclusion that there is no private cause of action against DSHS pursuant to RCW 74.34.200(1). This cause of action also does not apply to LMTAAA because AAAs are not individual providers or in-home services agencies required to be licensed by chapter 70.127 RCW. RCW 70.127.040(14). We affirm the trial court's dismissal of those claims.

Appellant briefly argues that LMTAAA was a mandatory reporter and breached its duty to report suspected abuse or neglect. Br. of Appellant at 39 (citing RCW 74.34.035(1); *Kim v. Lakeside Adult Family Home*, 185 Wn.2d 532, 546, 374 P.3d 121 (2016)). But she argued in her complaint that only LMTAAA and DSHS failed to investigate, and the trial court did not rule on this issue. We decline to address this issue. RAP 2.5(a); RAP 9.12.

## VI. CONCLUSION

We affirm the trial court's summary judgment dismissal of the appellant's claims against DSHS and LMTAAA.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99243-6

_(signature)_
Johnson, J.

WE CONCUR:

_(signature)_
González, C.J.

_(signature)_
Gordon McCloud, J.

_(signature)_
Madsen, J.

_(signature)_
Yu, J.

_(signature)_
Owens, J.

_(signature)_
Montoya-Lewis, J.

_(signature)_
Whitener, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Turner v. DSHS*, No. 99243-6
(Stephens, J., dissenting)

No. 99243-6

STEPHENS, J. (dissenting)—No one disputes that a legal duty exists in this case. The trial court and the majority both acknowledge, and I agree, that the respondents—the Washington State Department of Social and Health Services (DSHS) and Lewis-Mason-Thurston Area Agency on Aging (LMTAAA)—owed a common law duty of reasonable care to Kent Turner. The majority's lengthy discussion of special relationships and independent living crowds out much discussion of this duty, but the respondents undeniably owed a duty to Kent,[1] not to dictate his choices but to act reasonably in providing him services. By granting summary judgment on the issues of breach and causation with respect to the

---

[1] Consistent with the majority, I refer to Kent and Kathy Turner using their first names. No disrespect is intended.

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

respondents' recognized common law duty, the majority usurps the essential role of the trier of fact in negligence cases. Respectfully, I dissent.

This appeal follows the trial court's summary dismissal of Kent Turner's complaint against DSHS and LMTAAA, relieving both respondents from liability for Kent's tragic—and perhaps preventable—death. We review orders granting summary judgment de novo and "perform the same inquiry as the trial court, viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 164, 273, P.3d 965 (2012). It is important to remember that summary judgment reflects the legal conclusion that a trial would be "useless." *Olympic Fish Prods., Inc. v. Lloyd*, 93 Wn.2d 596, 602, 611 P.2d 737 (1980). In a negligence action, where questions of breach and proximate cause are ordinarily issues to be decided by the trier of fact, summary judgment on these issues is appropriate only where reasonable minds could not differ as to the relevant facts and favorable inferences drawn from the facts. *Id.*

This case presents no novel issues. It is a basic principle of negligence law that one who performs an affirmative act owes a common law duty to exercise reasonable care in that undertaking. *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 550-51, 442 P.3d 608 (2019); *see also Robb v. City of Seattle*, 176 Wn.2d 427, 436, 295 P.3d 212 (2013). The scope of the duty owed is measured by the scope of

2

*Turner v. DSHS*, No. 99243-6
(Stephens, J., dissenting)

the undertaking. *See Michaels v. CH2M Hill, Inc.*, 171 Wn.2d 587, 609, 257 P.3d 532 (2011) (holding a design professional's common law duty of reasonable care extended to those working on the property at the time the designs were being implemented). Here, no one contests that the respondents owed Kent a common law duty of reasonable care with respect to the actions they took to assist him. The scope of their duty is defined by the specific responsibilities the respondents undertook.

Unfortunately, fixated on the fact that Kent was not in the respondents' custody, the majority advances a truncated view of the scope of the duty in this case, limited to "LMTAAA's case management responsibilities in monitoring the in-home care Kent was receiving." Majority at 26. With respect to DSHS, the majority sees only "a responsibility to properly assess whether Kent qualified for long-term care services received independently." *Id.* at 29. But the scope of DSHS's and LMTAAA's undertaking is broader than the majority acknowledges.

DSHS facilitated Kent's move from an institutional setting into an apartment setting through its Road to Community Living (RCL) program. The purpose of the RCL program is to help individuals with long-term care needs move back into the community safely and successfully. The program is not designed to merely *assess eligibility* for independent living but to *affirmatively aid* the safe transition of vulnerable clients into a community setting. Majority at 8 ("[RCL] is a federally

3

*Turner v. DSHS*, No. 99243-6
(Stephens, J., dissenting)

funded program designed to help people transition from institutional settings and into the community."). Kent's RCL "Participation Information and Consent Form" stated he would receive services to help "[r]esolve concerns, questions or problems that could delay [Kent] from safely moving to, or remaining in, the community" and "[i]dentify and help plan for possible risks the move may present." Clerk's Papers (CP) at 867, 889. Relevant to the facts here, DSHS internal policy and state law expressly require that RCL care plans contain an emergency evacuation plan "developed and practiced with the client." WAC 388-101D-0170(2)(c). While LMTAAA managed day-to-day case management responsibilities after Kent's move, DSHS retained an authoritative role in his long-term care plan, and it could terminate its contract with LMTAAA at any time "if they [were] threatening the safety or health of [the] client." Majority at 5 (citing former RCW 74.39A.095(7) (2014)). DSHS could not simply wash its hands of a legal duty to Kent after transferring case management responsibilities to LMTAAA. Based on its own affirmative undertaking through RCL, DSHS indisputably retained a common law duty to exercise reasonable care when facilitating Kent's transition from a skilled nursing facility into the community. This duty encompassed the responsibility to reasonably ensure Kent's placement was safe and suited to his individual needs, to identify potential risks, and to create and practice an evacuation plan.

4

*Turner v. DSHS*, No. 99243-6
(Stephens, J., dissenting)

Although the decision to move from a residential setting to an apartment was left to Kent's choice, that choice did not absolve DSHS of its duty to exercise reasonable care when performing services within the scope of its RCL program. The majority's protracted analysis of special relationships and its single-minded focus on Kent's free agency serve only to obscure the common law duty owed by DSHS in these circumstances.[2] By fixating on principles of client choice and dignity, the majority overlooks the specific responsibilities DSHS undertook—namely, to manage Kent's safe transition into community living. Honoring client choice and dignity does not translate into immunizing DSHS from liability for harm to clients caused by unreasonable conduct within the scope of its undertaking. Even outside the framework of a special relationship, this common law duty remains.

Whether DSHS or LMTAAA breached their common law duties owed to Kent and whether such breach caused Kent's tragic death are quintessential fact questions entrusted to the trier of fact. Yet, the majority barely slows down to address them. The record in this case is replete with evidence that DSHS and LMTAAA failed to

---

[2] I agree with the majority's conclusion that the element of entrustment necessary to establish a special relationship is lacking in this case. But the majority should not be read to suggest that physical custody is always required to establish a special relationship. *See Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 295, 481 P.3d 1084 (2021) ("[O]ur cases establish a policy based on the special relationship where school districts may be liable for harms suffered by students even where the harm occurs off campus and is caused by the act of a third party.").

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

take reasonable steps to ensure Kent safely and successfully transitioned to a community setting. When viewing the evidence and all reasonable inferences in the light most favorable to the Turner estate, a reasonable jury could readily conclude the respondents' failures in this regard proximately caused Kent's death. Even a brief review of key relevant facts makes this clear.

Kent lived with multiple sclerosis, a chronic and progressive neurological disease that forced him into early retirement, severely impaired his fine motor skills, required his use of a wheelchair, and led him to seek professional assistance from the State in order to perform basic daily tasks. Kent's initial long-term care assessment described his functional limitations as "[g]eneral weakness, [p]oor hand/eye coordination, [w]eak grip, [and l]imited fine motor control." CP at 830. Kent needed help moving in and out of his wheelchair. He required assistance when getting dressed and undressed. He struggled to open the heavy door of his apartment and previously tied a scarf around the interior doorknob in order to accomplish this task. DSHS and LMTAAA knew Kent was a regular smoker, typically smoking a pack of cigarettes per day. He often refilled his own lighter fluid and more than once had spilled lighter fluid on himself while doing so. On at least one prior occasion, Kent inadvertently set his sleeve on fire when refilling his lighter fluid.

6

Turner v. DSHS, No. 99243-6
(Stephens, J., dissenting)

Despite this known risk, Kent's Capitol House Apartment, where he lived alone, lacked sprinklers. DSHS's sole evacuation plan in the event of an emergency was for Kent's caregivers to assist him—but his caregivers were only present 4 hours each day. Kent thus lacked any evacuation plan for the 20 hours per day he resided alone in his apartment. There is no evidence in the record that DSHS discussed the risks of Kent being alone in his apartment in the event he needed to evacuate. CP at 1457-58. No care provider ever practiced an evacuation plan with him either, as was required by DSHS policy and state law. CP at 1454, WAC 388-101D-0170(2)(c). And even though Kent frequently used a personal emergency response device to call the fire department during the time he lived with his wife, Kathy, he was never given one to use when he lived alone.

DSHS contends—and the majority agrees—that Kent "was his own decision maker." CP at 1458. But Kent's freedom of choice and the respondent's obligations are not mutually exclusive—particularly where DSHS and LMTAAA failed to identify and discuss known safety risks inherent to Kent's living situation and to develop a plan to manage those risks in the event of an emergency. Whether DSHS and LMTAAA's failure to identify and discuss these risks with Kent breached their duties of reasonable care is a question of fact best resolved by a jury.

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Turner v. DSHS*, No. 99243-6
(Stephens, J., dissenting)

Further, the circumstances of Kent's death create a jury question on the issue

of proximate cause. It is well established that the defendant's negligence need not

be the *sole* cause of an injury to satisfy proximate cause, but simply *a* cause.

*Brashear v. Puget Sound Power & Light Co.*, 100 Wn.2d 204, 207-08, 667 P.2d 78

(1983). In this case, Kent died alone in an accidental fire. On the day of his death,

first responders found Kent lifeless in his wheelchair directly in front of his

apartment door—as if he attempted, but failed, to escape through the heavy door of

his apartment. While its origins remain unconfirmed, an investigation showed the

fire was isolated to Kent's wheelchair and person. A reasonable inference is that the

fire started on the wheelchair or on Kent himself. Perhaps sprinklers might have

extinguished the fire. Perhaps by developing and practicing an evacuation plan with

Kent beforehand, DSHS might have realized the challenges of him opening the

apartment door unassisted. Perhaps an evacuation plan developed specifically to

accommodate Kent's physical limitations would have allowed him to escape.

Simple access to an emergency response device might have allowed Kent to call the

fire department before the alarm system sounded—perhaps early enough for first

responders to reach Kent before he died.

Viewing the evidence and all reasonable inferences in the light most favorable

to the estate, it cannot be said on this record that no trier of fact could conclude the

8

*Turner v. DSHS*, No. 99243-6
(Stephens, J., dissenting)

respondents' failure to exercise reasonable care, within the scope of the assistance they agreed to provide, contributed to Kent's tragic death. Regardless of any special relationship, it is a gross usurpation of the role of the jury in our system of justice to grant summary judgment on these intensely factual issues. The record contains proffered evidence, albeit disputed, that would support a jury finding on breach and proximate cause with respect to the respondents' common law duties. The majority's vague description of the relevant facts as "not sufficiently separated from the argument that a special relationship existed" improperly minimizes both the scope of the respondents' duty and the jury's role in assessing the standard of care, breach, and causation. Majority at 29. I would reverse the trial court's grant of summary judgment and remand for trial on the common law negligence claims.

Stephens, J.